

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-15-2005

# Woodall v. Fed Bur Prisons

Precedential or Non-Precedential: Precedential

Docket No. 05-3657

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Woodall v. Fed Bur Prisons" (2005). *2005 Decisions*. Paper 18.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/18

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-3657

———

SHAWN JAMES ALLEN WOODALL,

*Appellant*

v.

FEDERAL BUREAU OF PRISONS; WARDEN JOHN NASH;
HARLEY G. LAPPIN, DIRECTOR

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 05-cv-01542)
District Judge: Honorable Freda L. Wolfson

———

Argued November 15, 2005
Before: ROTH, FUENTES, and BECKER, *Circuit Judges.*

(Filed December 15, 2005)

OPINION OF THE COURT

———

MARY GIBBONS, ESQ. (ARGUED)
600 Mule Road, #16
Holiday Plaza III
Toms River, New Jersey 08757

*Attorney for Appellant*

CHRISTOPHER J. CHRISTIE, ESQ.
UNITED STATES ATTORNEY
DOROTHY DONNELLY, ESQ.
ASSISTANT UNITED STATES ATTORNEY
United States Attorney's Office
402 East State Street, Room 502
Trenton, New Jersey 08608

HENRY J. SADOWSKI, ESQ. (ARGUED)
Federal Bureau of Prisons
2nd & Chestnut Streets
United States Customs House
7th Floor
Philadelphia, Pennsylvania 19106

*Attorneys for Appellants*

BECKER, *Circuit Judge*.

Shawn James Allen Woodall, a federal prisoner, challenges recently adopted Bureau of Prison ("BOP") regulations that limit a prisoner's placement in community confinement to the lesser of ten percent of the prisoner's total sentence or six months. Woodall's appeal from the order of the District Court denying his petition for a writ of habeas corpus presents two important questions. First, may Woodall bring this challenge in habeas? Because we believe that Woodall's challenge goes to the execution of his sentence, we hold that habeas corpus does lie. Second, we must decide whether the new BOP regulations run afoul of the BOP's governing statute and congressional intent. We believe that they do. The governing statute at issue here, 18 U.S.C. § 3621(b), lists five factors that the BOP must consider in making placement and transfer determinations. The 2005 regulations, which categorically limit the amount of time an inmate may be placed in a Community Corrections Center ("CCC"), do not allow the BOP to consider these factors in full. We will therefore vacate the judgment of the District Court, and remand for further proceedings.

*I. Facts and Procedural History*

Woodall is currently incarcerated at the Federal Correctional Institution at Fort Dix, New Jersey. He was convicted of alien smuggling in the United States District Court for the Southern District of California and was sentenced on December 15, 2000, to a 37-month imprisonment to be followed by three years of supervised release. On September 30, 2002, after pleading guilty to an escape charge under 18 U.S.C. § 751, Woodall was sentenced to another six months of imprisonment to be followed by three years of supervised release. He was released on March 26, 2004, to serve the three-year term of supervised release.

On April 7, 2004, Woodall was arrested by California authorities for possession of a controlled substance. At sentencing, Woodall represented that his offense was a result of the fact that he was released by the BOP on March 26, 2004, with "no money, no identification and no assets, into a community where he had no ties whatsoever."[1] On September 7, 2004, the

---

[1] Woodall explained to the sentencing court that he was released on a Friday, and that 30 days before his release he had asked to have his probation moved from California – where he had no ties – to Oklahoma where his family lived. He claims that he spoke with a correctional center authority and wrote a letter to the probation department claiming "I am about to get out of prison. . . . It's on a Friday. I do not want to be released in the community with no assets. No money. Just the clothes on my back. No identification. No nothing." However, he received no assistance. Woodall wrote a letter to his sentencing court, expressing his concern. He sought halfway house placement, or money, neither of which he obtained. Woodall states that once he was released, with no money or housing, he went to his probation department to explain that he was homeless and needed a transfer or assistance. He was told that his probation officer was on vacation and was given no assistance. He claimed that "[o]n April 7th , I am on the streets living in a blanket on the streets in San Diego on a sidewalk with nothing. After 46 months of imprisonment with not a penny in my pocket. I am in a drug infested neighborhood." The

3

District Court for the Southern District of California revoked Woodall's supervised release for the earlier alien smuggling conviction and sentenced him to eighteen months imprisonment with no supervised release. The next day, his supervised release was revoked with respect to the escape conviction, and he was sentenced to twelve additional months in prison. The sentence imposed was below the guideline range "based on Mr. Woodall's comments as to the situation he found himself in on the streets without any money, and the fact that the government concurs that's what happened." *See supra* note 1.

Significantly, on February 3, 2005, the sentencing judge entered an order amending the sentencing judgment and recommending to the Bureau of Prisons that Woodall spend the last six months of his sentence in a halfway house. The Assistant United States Attorney on the case "urged" that placement. Woodall now remains in custody with a projected release date of April 3, 2006. While his sentencing judge recommended a halfway house placement for the final six-months of his sentence, Woodall was informed by the Unit Manager at Fort Dix that because of the BOP policy changes at issue in this appeal, he could be placed in a CCC for no more than 10 percent of his total sentence. Therefore, Woodall would be entitled to no more than eleven weeks of CCC placement. According to the government, Woodall will be placed in community confinement on or around January 16, 2006.

Woodall thereupon filed a habeas petition pursuant to 28 U.S.C. § 2241, arguing that the new BOP regulations impermissibly ignored the placement recommendations of his sentencing judge.[2] His petition was dismissed by the District

---

government did not dispute these facts.

[2]The District Court excused Woodall's failure to exhaust his administrative remedies. It determined that exhaustion would be futile, given that Woodall is not challenging the application of the BOP regulations, but their validity. The government does not contest this issue on appeal. We agree with the District Court that the purposes of exhaustion would not be served here by requiring Woodall to exhaust his administrative remedies, and we affirm on this matter. *See, e.g.*, *Pimentel v. Gonzalez*, 367 F. Supp. 2d 365

Court for the District of New Jersey on July 20, 2005. The Court found that the new BOP regulations were a "permissive construction of the relevant statutes." The Court emphasized that the regulations are entitled to considerable deference and cited *Lopez v. Davis*, 531 U.S. 230, 243-44 (2001), in support of its decision. This appeal followed.[3]

## II. Bureau of Prison Placement Policies and the Relevant Statutory Provisions

This appeal turns on the interpretation of two statutes. Under 18 U.S.C. § 3621(b), the BOP is vested with authority to determine the location of an inmate's imprisonment. That statute not only grants the BOP placement authority, it lists factors for consideration in making placement and transfer determinations:

> (b) Place of imprisonment. The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau *may* designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, *considering*--
> > (1) the resources of the facility contemplated;
> > (2) the nature and circumstances of the offense;
> > (3) the history and characteristics of the prisoner;
> > (4) *any statement by the court that imposed the sentence*--
> > > (A) *concerning the purposes for which the*

(E.D.N.Y. 2005).

[3]We have jurisdiction to review the dismissal of Woodall's petition pursuant to 28 U.S.C. §§ 1291 and 2253(a). We exercise plenary review over the District Court's legal conclusions as no evidentiary hearing was conducted by the District Court. *See Ruggiano v. Reish*, 307 F.3d 121, 126 (3d Cir. 2002).

5

*sentence to imprisonment was determined to be warranted; or*

        (B) *recommending a type of penal or correctional facility as appropriate; and*

    (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, *having regard for the same matters, direct the transfer of a prisoner* from one penal or correctional facility to another.

18 U.S.C. § 3621 (emphasis added).

A more specific provision, 18 U.S.C. § 3624(c), describes the BOP's obligation to prepare prisoners for community re-entry by, *inter alia*, placing them in community confinement:

(c) Pre-release custody. The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement.

18 U.S.C. § 3624(c).

Prior to December 2002, the BOP regularly considered prisoners for CCC placement for up to six months at the end of a sentence, regardless of the total sentence length.[4] "These

---

[4]The BOP appears to consider all community confinement facilities – including community confinement centers or halfway

practices were entirely routine, and were all but taken for granted by all participants: the BOP, the Probation Office, the U.S. Attorney's Office, the defense bar, and the judiciary." *United States v. Serpa*, 251 F. Supp. 2d 988, 990 (D. Mass. 2003) (citation omitted). However, on December 13, 2002, the Department of Justice Office of Legal Counsel ("OLC") issued a memorandum concluding that the BOP's practice of placing some prisoners in CCCs for all or significant parts of their sentences was contrary to the BOP's statutory grant of authority.

The 2002 memo concluded that the BOP did not have "general authority" under § 3621 to place an offender in community confinement from the outset of his sentence or at any time the BOP chooses. Instead, the memo reasoned that authority to transfer a prisoner to a CCC is derived solely from § 3624, and that the statute limits residence in a CCC to the lesser of 10 percent of the total sentence or six months. On December 20, 2002, the BOP followed the OLC's advice and memorialized it.

The First Circuit and the Eighth Circuit found this 2002 policy unlawful because it did not recognize the BOP's discretion to transfer an inmate to a CCC at any time, and therefore contrary to the plain meaning of § 3621. *See Elwood v. Jeter*, 386 F.3d 842 (8th Cir. 2004); *Goldings v. Winn*, 383 F.3d 17 (1st Cir. 2004). The rationale of these decisions was that the time constraints of § 3624(c) limited only the affirmative obligation of the BOP, not the agency's discretion to place a prisoner in a CCC for a longer period of time.

In response to decisions such as *Elwood* and *Goldings*, on August 18, 2004, the BOP proposed new regulations "announcing its categorical exercise of discretion for designating inmates to community confinement when serving terms of imprisonment." 69 Fed. Reg. 51,213 (Aug. 18, 2004). While acknowledging the BOP's general discretion to place an inmate at a CCC at any time, the 2005 regulations limit CCC placement to the lesser of 10 percent of a prisoner's total sentence or six months, unless special statutory circumstances apply. *Id.* The

---

houses – as indistinguishable for purposes of this question. We accept that understanding here and use the term "CCC" as shorthand.

final rules were published on January 10, 2005, after Woodall's petition had been filed, and became effective on February 14, 2005. They, of course, apply to this case.

The final CCC designation regulations read as follows:

**§ 570.20 What is the purpose of this subpart?**
(a) This subpart provides the Bureau of Prisons' (Bureau) *categorical exercise of discretion for designating inmates to community confinement*. The Bureau designates inmates to community confinement only as part of pre-release custody and programming which will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry into the community.

(b) As discussed in this subpart, the term "community confinement" includes Community Corrections Centers (CCC) (also known as "halfway houses") and home confinement.

**§ 570.21 When will the Bureau designate inmates to community confinement?**

(a) The Bureau will designate inmates to community confinement only as part of pre-release custody and programming, *during the last ten percent of the prison sentence being served, not to exceed six months*.

(b) We may exceed these time-frames *only* when specific Bureau programs allow greater periods of community confinement, as provided by separate statutory authority (for example, residential substance abuse treatment program (18 U.S.C. 3621(e)(2)(A)), or shock incarceration program (18 U.S.C. 4046(c)).

28 C.F.R. §§ 570.20, 570.21 (emphasis added).

As explained above, the question before us is whether these new regulations are contrary to, or a permissible

8

construction of, Congress's directives as set out in 18 U.S.C. § 3621(b). Because we believe that the new policy does not allow for full consideration of the factors plainly enumerated in § 3621(b), we conclude that they are not.

### *III. May Woodall Proceed under 28 U.S.C. § 2241?*

We must first determine whether Woodall may proceed under 28 U.S.C. § 2241. Though the government wants us to address the merits of Woodall's contentions, it feels constrained to argue that the District Court lacked habeas jurisdiction to consider Woodall's petition because he is challenging the "conditions" of his confinement or a routine prison transfer, rather than the fact or duration of his sentence. It cites Supreme Court and Third Circuit case law for the proposition that only a challenge to the very fact or duration of a sentence may be challenged in habeas. In response, Woodall argues that his claim can be brought under § 2241 because it arises from the "execution" of his sentence.

Resolution of this issue is far from clear, for there are credible arguments on both sides of this complicated matter. However, we are persuaded by the reasoning of the courts holding that what is at issue here is the "execution" of Woodall's sentence.

We have ourselves held that § 2241 allows a federal prisoner to challenge the "execution" of his sentence in habeas. This was noted in *Coady v. Vaughn*, 251 F.3d 480, 485 (3d Cir. 2001), where we distinguished § 2255 from § 2241:

> [F]ederal prisoners challenging some aspect of the *execution* of their sentence, such as denial of parole, may proceed under Section 2241. This difference arises from the fact that Section 2255, which like Section 2241 confers habeas corpus jurisdiction over petitions from federal prisoners, is expressly limited to challenges to the validity of the petitioner's sentence. Thus, Section 2241 is the only statute that confers habeas jurisdiction to hear the petition of a federal prisoner who is challenging not the validity but the *execution of his sentence*.

(footnote omitted and emphasis added). We reiterated this distinction in *United States v. Eakman*, 378 F.3d 294, 297 (3d Cir. 2004).[5] Still, the precise meaning of "execution of the sentence" is hazy. In attempting to decipher it, we are informed by the language of the Second, Sixth, Ninth, and Tenth Circuits, all of which have found that prisoners challenging the manner of their imprisonment may proceed under § 2241.

For example, in *Jiminian v. Nash*, 245 F.3d 144 (2d Cir. 2001), the Second Circuit opined: "A motion pursuant to § 2241 generally challenges the *execution* of a federal prisoner's sentence, including such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison

---

[5]The government cites several cases for the proposition that a prisoner's challenge to the "conditions of his confinement" must fall outside of habeas. *See Nelson v. Campbell*, 541 U.S. 637, 643 (2004); *Preiser v. Rodriguez*, 411 U.S. 475 (1973); *Leamer v. Fauver*, 288 F.3d 532 (3d. Cir. 2002). However, even if what is at issue here is "conditions of confinement," these cases analyze only the question whether a § 1983 action must be dismissed because the claim asserted lies at the "core of habeas," and determine only when § 1983 provides no remedy, not when a prisoner is precluded from filing a habeas petition.

*Nelson* provides little guidance on this question. In that case, a prisoner filed an action under § 1983, claiming that the procedure to be used to lethally inject him constituted cruel and unusual punishment. The government contended that the inmate was challenging his sentence and therefore could only seek relief in habeas. The Supreme Court disagreed and held unanimously that the action *could* be brought under § 1983. While the Court discussed the difference between § 1983 and habeas, at no point did it state that the prisoner could *not* have filed a habeas petition. As the Court determined, the only question before it was "whether § 1983 [was] an appropriate vehicle." *Nelson*, 541 U.S. at 639. As the Ninth Circuit has noted, "The [Supreme] Court's central concern . . . has been with how far the general remedy provided by § 1983 may go before it intrudes into the more specific realm of habeas, not the other way around." *Docken v. Chase*, 393 F.3d 1024, 1028 (9th Cir. 2004).

disciplinary actions, prison transfers, type of detention and prison conditions." *Id.* at 147 (citing *Chambers v. United States*, 106 F.3d 472, 474-75 (2d Cir. 1997)). The Ninth Circuit has used similar language in distinguishing between § 2255 and § 2241. In *Hernandez v. Campbell*, 204 F.3d 861, 864 (9th Cir. 2000), the Court noted that, in the case of a federal prisoner, motions contesting the "legality" of a sentence must generally be filed under § 2255 while challenges to the "manner, location, or conditions of a sentence's execution" must be brought pursuant to § 2241.

The Sixth Circuit, in an opinion cited by us in *Coady*, has also found an action under § 2241 appropriate for an inmate's challenge to a transfer cognate to the one at bar. Addressing a claim that arose when the BOP threatened to move a prisoner from a community treatment center to a "more secure facility," the Court found § 2241 appropriate because "the manner in which the sentence was being executed" was challenged. *See United States v. Jalili*, 925 F.2d 889, 893 (6th Cir. 1991). In *Coady*, we cited *Jalili* for its proposition that a "challenge to [the] place of imprisonment" is "properly brought under Section 2241." 251 F.3d at 485. Similarly, the Tenth Circuit found a petition under § 2241 proper where a prisoner challenged his transfer from a Wyoming state-operated prison to a private Texas facility. *See Montez v. McKinna*, 208 F.3d 862, 865 (10th Cir. 2000) ("Such an attack, focusing on where his sentence will be served, seems to fit better under the rubric of § 2241.").[6] Additionally, a number of district courts analyzing the 2005 BOP regulations or the previous 2002 policy have discussed this jurisdictional question and found that a § 2241 petition is the proper mechanism for relief.[7]

---

[6]In invalidating the BOP's 2002 policy in *Elwood v. Jeter*, 386 F.3d 842, 844 (8th Cir. 2004), the Eighth Circuit accepted Elwood's § 2241 petition, but did not discuss this jurisdictional issue. The First Circuit, in *Goldings v. Winn*, 383 F.3d 17 (1st Cir. 2004), also declared the 2002 policy unlawful but did not discuss the source of the Court's jurisdiction.

[7]*See, e.g.*, *Pimentel v. Gonzalez*, 367 F. Supp. 2d 365, 369-71 (E.D.N.Y. 2005); *United States v. Paige*, 369 F. Supp. 2d 1257,

The circuits are not in agreement on this matter, however. The Seventh Circuit has drawn a different line and apparently would find a § 2241 petition improper here. In *Richmond v. Scibana*, 387 F.3d 602 (7th Cir. 2004), the Court did not address whether the petitioner was challenging the "execution" of his sentence but did hold that a challenge to the BOP's 2002 policy could not lie in habeas. It emphasized that the petitioner did not present a "claim of entitlement to be released." *Id.* at 605.

We think that the better rule is that of the Second, Sixth, Ninth, and Tenth Circuits, and of the district courts referred to in note 8, *supra*. The approach of these courts is consistent with notions of the plain meaning of the term "execution," which is to "put into effect" or "carry out." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 794 (1993). Carrying out a sentence through detention in a CCC is very different from carrying out a sentence in an ordinary penal institution. More specifically, in finding that Woodall's action was properly brought under § 2241, we determine that placement in a CCC represents more than a simple transfer. Woodall's petition crosses the line beyond a challenge to, for example, a garden variety prison transfer.

The criteria for determining CCC placement are instrumental in determining how a sentence will be "executed." CCCs and similar facilities, unlike other forms of incarceration, are part of the phase of the corrections process focused on reintegrating an inmate into society. The relevant statute specifically provides that a prisoner should be placed in a CCC or

1259 (D. Mont. 2005) ("[A] federal criminal defendant seeking to challenge the manner, location, or conditions of a sentence's execution must proceed with a petition for habeas corpus, brought pursuant to § 2241 . . . ."); *Franceski v. Bureau of Prisons*, No. 04 Civ. 8667, 2005 U.S. Dist. LEXIS 5961, at \*6-\*13 (S.D.N.Y. Apr. 8, 2005); *Norrito v. DeRosa*, No. 04-610, 2004 U.S. Dist. LEXIS 28789, at \*1 n.1 (D.N.J. Aug. 11, 2004); *Grimaldi v. Menifee*, No. 04 Civ. 1340, 2004 U.S. Dist. LEXIS 7455, at \*6-\*8 (S.D.N.Y. Apr. 29, 2004); *Zucker v. Menifee*, No. 03 Civ. 10077, 2004 U.S. Dist. LEXIS 724, at \*8-\*11 (S.D.N.Y. Jan. 21, 2004) (collecting cases). A number of district courts have also accepted an inmate's § 2241 petition without further discussion.

similar institution at the end of a prison sentence to "afford the prisoner a reasonable opportunity to adjust to and prepare for . . . re-entry into the community." 18 U.S.C. § 3624. CCCs thus satisfy different goals from other types of confinement. We have noted the relatively lenient policies of CCCs as compared to more traditional correctional facilities. CCC pre-release programs often include an employment component under which a prisoner may leave on a daily basis to work in the community. Inmates may be eligible for weekend passes, overnight passes, or furloughs. *See United States v. Hillstrom*, 988 F.2d 448 (3d Cir. 1993); *see also United States v. Latimer*, 991 F.2d 1509, 1513 (9th Cir. 1993) (emphasizing that community confinement is "qualitatively different" from confinement in a traditional prison).

Given these considerations, and the weight of authority from other circuits, especially *Jalili*, we conclude that Woodall's challenge to the BOP regulations here is a proper challenge to the "execution" of his sentence, and that habeas jurisdiction lies.[8]

*IV. The Statutory Question*

We note at the outset that no court of appeals has addressed the validity of the 2005 regulations. The district courts are divided. Many have invalidated the 2005 regulations.[9] On the other hand, several district court opinions have upheld the

---

[8]Woodall argues that if his challenge is not properly brought in habeas, he is entitled to mandamus relief pursuant to 28 U.S.C. § 1361. Because we find the habeas action proper, we decline to address this contention.

[9]*See, e.g., Baker v. Willingham*, No. 3:04cv1923, 2005 U.S. Dist. LEXIS 23468 (D. Conn. Sept. 16, 2005); *Wiederhorn v. Gonzales*, No. 05-360-TC, 2005 U.S. Dist. LEXIS 15079 (D. Or. May 9, 2005); *United States v. Paige*, 369 F. Supp. 2d 1257 (D. Mont. 2005); *Drew v. Menifee*, No. 04 Civ. 9944, 2005 U.S. Dist. LEXIS 3423 (S.D.N.Y. Mar. 4, 2005); *Pimentel v. Gonzalez*, 367 F. Supp. 2d 365 (E.D.N.Y. 2005); *Cook v. Gonzales*, No. 05-09-AS, 2005 U.S. Dist. LEXIS 8771 (D. Or. Apr. 5, 2005); *Crowley v. Fed. Bureau of Prisons*, 312 F. Supp. 2d 453 (S.D.N.Y. 2004).

regulations.[10]

We agree with the reasoning of those courts that have found the regulations unlawful. The regulations do not allow the BOP to consider the nature and circumstances of an inmate's offense, his or her history and pertinent characteristics, or most importantly, any statement by the sentencing court concerning a placement recommendation and the purposes for the sentence. And yet, according to the text and history of § 3621, these factors must be taken into account. The regulations are invalid because the BOP may not categorically remove its ability to consider the explicit factors set forth by Congress in § 3621(b) for making placement and transfer determinations.[11]

The government argues that the BOP appropriately exercised its "sweeping authority" in categorically declining to consider inmates for CCC placement prior to the last 10 percent or six months of a sentence. It submits that the BOP's interpretation is entitled to deference under *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and that the 2005 regulations comport with and clarify congressional intent. It relies on *Lopez v. Davis*, 531 U.S. 230, 243-44 (2001), for support. The government also maintains that the § 3621(b) factors are "nonexhaustive" and not mandatory, and that the BOP will continue to consider them in placement decisions. It contends that while the BOP was not required to consider the § 3621 factors in promulgating its rules, it did in fact consider "the

---

[10]*See, e.g., Charboneau v. Menifee*, No. 05 Civ. 1900, 2005 U.S. Dist. LEXIS 21622 (S.D.N.Y. Sept. 28, 2005); *Lee v. United States*, No. 04-0610-CG-C, 2005 U.S. Dist. LEXIS 27387 (S.D. Ala. Sept. 6, 2005)*; Moss v. Apker*, 376 F. Supp. 2d 416 (S.D.N.Y. 2005); *Jackson v. Fed. Bureau of Prisons*, No. 05-2339, 2005 U.S. Dist. LEXIS 26724 (D.N.J. July 20, 2005); *Troy v. Apker*, No. 05 Civ. 1306, 2005 U.S. Dist. LEXIS 14275 (S.D.N.Y. June 30, 2005); *Yip v. Fed. Bureau of Prisons*, 363 F. Supp. 2d 548 (E.D.N.Y. 2005).

[11]These same factors apply to prison and CCC *transfers*, as well as initial placements, given that Congress specified that transfers may be made "having regard for the same matters." *See* 18 U.S.C. § 3621(b).

14

statutory factors" in addition to others. We discuss these construction arguments first and then turn to the *Chevron* analysis.

      A.      *The Plain Meaning and Legislative History of 18 U.S.C. § 3621(b)*

Section 3621(b) provides that the BOP must consider at least five factors in making placement decisions:

> (1) the resources of the facility contemplated;
> (2) the nature and circumstances of the offense;
> (3) the history and characteristics of the prisoner;
> (4) any statement by the court that imposed the sentence--
>     (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
>     (B) recommending a type of penal or correctional facility as appropriate; and
> (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

18 U.S.C. § 3621(b). Yet, under the regulations, these factors cannot be fully considered because the amount of time an inmate may spend in a CCC is categorically limited to the lesser of six months or ten percent of a sentence without regard to individualized circumstances.

The government argues that the use of the word "may" at the beginning of § 3621(b), rather than "shall," is determinative in proving that consideration of the factors is essentially optional. We believe that this narrow reading ignores the context of the statute. *See Deal v. United States*, 508 U.S. 129, 132 (1993) (noting the "fundamental principle of statutory construction . . . that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used"). A common-sense reading of the text – especially when combined with the legislative history – makes clear that the BOP is required to consider each factor. "May" refers to the ability of the BOP to

15

make ultimate placement designations, not to the § 3621 factors. The word "may" is a full fifty words away from the considerations, and its effect is separated from the factors with a comma.

Additionally, the use of the word "and" before the final factor in the five-part list indicates that Congress intended for the BOP to weigh *all* of the factors listed. *See Lesnick v. Menifee*, 05 Civ. 4719, 2005 U.S. Dist. LEXIS 23183, at *13 (S.D.N.Y. Oct. 11, 2005). In sum, we believe the statute indicates that the BOP *may* place a prisoner where it wishes, *so long as* it considers the factors enumerated in § 3621.

Our reading is bolstered by the statute's legislative history, which states that the BOP is "specifically required" to consider the § 3621(b) factors – including any statement by the court that imposed the sentence – before it can properly place or transfer an inmate. A Report of the Senate Judiciary Committee, accompanying the enactment of § 3621, is informative. The report states:

> In determining the availability or suitability of the facility selected, the Bureau is *specifically required* to consider such factors as the resources of the facility considered, the nature and circumstances of the offense, the history and characteristics of the prisoner, the statements made by the sentencing court concerning the purposes for imprisonment in a particular case, any recommendations as to type of facility made by the court, and any pertinent policy statements issued by the sentencing commission pursuant to proposed 28 U.S.C. § 994(a)(2). *After considering these factors*, the Bureau of Prisons *may* designate the place of imprisonment in an appropriate type of facility, or may transfer the offender to another appropriate facility.

S. REP. NO. 98-225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3324-25 (emphasis added).

This language is clear – the BOP *must* consider all of the listed factors. The report continues:

> The Committee, by listing factors for the Bureau to consider in determining the appropriateness or suitability of any available facility, does not intend to restrict or limit the Bureau in the exercise of its existing discretion so long as the facility meets the minimum standards of health and habitability of the Bureau, but intends simply to set forth the appropriate factors that the Bureau *should consider* in making the designations.

*Id.* at 3325 (emphasis added). The Senate report supports the proposition that Congress did not intend to limit the BOP's overall placement discretion to "designate the place of [a] prisoner's imprisonment." However, it is also clear that, before exercising that discretion, the BOP "should consider" each of the § 3621 factors. Because the 2005 regulations do not allow the BOP to consider the factors enumerated in § 3621, they are invalid.

### B. Lopez v. Davis

Both the government and the District Court rely on *Lopez*, 531 U.S. at 243-44, for the proposition that the BOP may categorically exercise its discretion in placement matters, and that it properly utilized that discretion here. In *Lopez*, the Supreme Court considered and upheld the validity of a BOP rule excluding certain inmates from a discretionary early-release program. *Id.* at 243-44. The governing statute in that case, 18 U.S.C. § 3621(e)(2)(B), provided that the BOP *may* reduce the prison term of an inmate convicted of a "nonviolent offense" if the prisoner successfully completes a substance abuse program. *Id.* at 232. The BOP implemented a regulation categorically denying early release to prisoners convicted of a felony involving "the carrying, possession, or use of a firearm." *Id.* (quoting 28 C.F.R. § 550.58(a)(1)(vi)(B)). In upholding the regulation, the Court held that the BOP permissibly defined "nonviolent offense" to exclude inmates who possessed firearms. *Id.* at 235-36. The statute gave the BOP the ability to offer pre-release to some inmates; therefore, the Court reasoned that it was permissible for the BOP to use that discretion to delineate an additional category of

17

inmates who were ineligible for that release. *Id.* at 238.

In *Lopez*, the statute clearly demonstrated that Congress was worried about allowing possibly violent inmates to become eligible for pre-release. The BOP's rules reflected that concern and seemed to provide a way to advance it. The BOP can make no such claim here because the 2005 regulations do not further the factors in the BOP's enabling statute – they reject them. *See Pimentel*, 367 F. Supp. 2d at 374; *Lesnick*, 2005 U.S. Dist. LEXIS 23183, at *25-*27; *Baker v. Willingham*, No. 3:04cv1923, 2005 U.S. Dist. LEXIS 23468, at *20-*21 (D. Conn. Sept. 16, 2005).

In *Lopez*, for example, the BOP argued that because Congress did not address how the Bureau should exercise its discretion, it could categorically exclude certain inmates from pre-release eligibility. The Court explained that individualized consideration for each particular inmate was not necessary, agreeing with the Eighth Circuit that "[t]he statute grants no entitlement to any inmate or class of inmates . . . and it does not instruct the Bureau to make 'individual, rather than categorical, assessments of eligibility for inmates convicted of nonviolent offenses.'" 531 U.S. at 237 (citation omitted). The Court emphasized that "Congress left the question unaddressed" and "has not identified any further circumstance in which the Bureau either must grant the reduction or is forbidden to do so." *Id.* at 240, 242.

Here, in contrast, Congress specifically delineated factors to be taken into account by the BOP in determining where an inmate is placed. Worthy of special mention is the recommendation of the sentencing judge. United States District Judges take their sentencing responsibilities very seriously and are familiar with the various BOP institutions and programs. Their recommendations as to the execution of sentences are carefully thought out and are important to them. The significance of this aspect of the sentencing process is highlighted by the acknowledgment of the regional counsel of the BOP at oral argument that the BOP follows judicial recommendations in approximately 85-90 percent of all cases. Here, however, the requirement that the BOP consider a sentencing judge's recommendation cannot be satisfied without an individualized, case-by-case inquiry that is impossible under the regulations.

The District Court and the government cite the following passage from *Lopez* in support of the argument that the circumstances here were contemplated by the Court: "'Even if a statutory scheme requires individualized determinations,' which this scheme does not, 'the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority.'" *Lopez*, 531 U.S. at 243-44 (quoting *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 612 (1991)). But sentencing recommendations and other individual factors, like those at play in Woodall's case, are not generally applicable. Moreover, Congress *did* appear to express an intent to withhold from the BOP the authority to make CCC placements without the guidance of the statutory factors.

In sum, individual determinations are required by § 3621(b). *Lopez* therefore does not control. While the BOP may exercise considerable discretion, it must do so using the factors the Congress has specifically enumerated.

C.      *The BOP's Arguments that the § 3621(b) Factors Are Not Mandatory and that it May Consider Additional Factors in Placement Decisions*

The government argues that the BOP may categorically remove consideration of the § 3621(b) factors because these factors are not mandatory. As support, both the government and the commentary accompanying the BOP's proposed rules stress that the BOP can always consider *additional* factors in making CCC determinations. *See* 69 Fed. Reg. at 51,213 ("Section 3621(b) provides a nonexclusive list of factors that the bureau is to consider . . . ."). We find this argument unpersuasive. The question whether the BOP may consider additional factors is separate and unrelated to the question whether it can ignore altogether the very factors delineated by Congress in the governing statute itself. Neither the BOP nor the government has cited a single indication that Congress felt the BOP could categorically refuse to consider in full one of the factors explicitly enumerated in § 3621.

In the commentary accompanying its final regulations, and in response to criticism of the proposed rule, the BOP stated that

19

it would "continue to evaluate" the § 3621(b) factors "when making individualized designations to appropriate Bureau facilities." 70 Fed. Reg, 1659, 1660 (Jan. 10, 2005). The Government similarly states that the BOP continues to consider the "nonexhaustive list" when making placement decisions. However, as stated above, it is impossible for each of these factors, particularly the sentencing judge's recommendations, to be taken into account in CCC placements under the new regulations. While the sentencing court here recommended six months of halfway house placement, under the regulations, that recommendation cannot be considered in full. In fact, *no* recommendation of a CCC placement exceeding six months or ten percent of a sentence can be considered. It is not enough for the BOP to consider the statutory factors only when placing prisoners in non-CCC facilities – they must be considered in every placement.

### D. *Consideration of the Statutory Factors in Promulgating the 2005 Rules*

The BOP has stated, and the District Court agreed, that it considered the statutory factors in *promulgating* the 2005 rules. 69 Fed. Reg. at 51,214 ("The Bureau has carefully considered all of the statutorily-specified factors, as well as the additional considerations that it identified as pertinent.") However, while the commentary accompanying the proposed and final rules specifically discusses some of the § 3621 factors – for example prison resources and Sentencing Commission policy statements – at no point does the BOP take into account the requirement that it consider the particular circumstances of individual inmates. By definition, particular circumstances cannot be considered in promulgating a blanket rule. Notably, Congress expressed an intent that the BOP take into account the sentencing judge's recommendation. By its very nature, this requires an individualized determination for each prisoner that the new regulations categorically do not allow. It is simply not possible to consider individualized circumstances in the drafting room before a prisoner even enters the criminal justice system.

### E. Chevron *Analysis*

20

Our review of an agency's interpretation of its governing statute is normally subject to *Chevron* deference. This standard of review requires a two-step inquiry:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron*, 467 U.S. at 842-43.

For the reasons stated above, it appears to us that the BOP's regulations do not meet the first prong of the *Chevron* test. This first prong of *Chevron* asks whether "the intent of Congress is clear" as to the question at issue. Here, considering the language of § 3621(b), and finding support in the statute's legislative history, we believe that it is. To be sure, the BOP has been granted broad discretion in placement matters. However, "[e]ven for an agency able to claim all the authority possible under *Chevron*, deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." *Gen. Dynamics Land Sys. v. Cline*, 540 U.S. 581, 600 (2004). Here, we are faced with a statute providing that the BOP must consider several factors in CCC placement, and a regulation providing that the agency may not consider those factors in full. The conflict between the regulations and the statute seems unavoidable.

However, even assuming the statute is ambiguous, we do not find the regulations to be "based on a permissible construction of the statute." *See Chevron*, 467 U.S. at 843.

21

Therefore, they cannot pass the second prong of *Chevron*. Under this second step, "we must determine whether the regulation[s] harmonize[] with the plain language of the statute, its origin, and purpose." *Zheng v. Gonzales*, 422 F.3d 98, 119 (3d Cir. 2005) (citation and internal quotation marks omitted). For the reasons stated above, taking into consideration the language and purpose of the statute, as well as its legislative history, we find harmony lacking.[12] We do not believe that the regulations are a permissible construction because they fail to take into account Congress's indications that certain individualized factors – including a sentencing court's recommendations – should be considered in the BOP's placement and transfer scheme. Therefore, the regulations are not "reasonable in light of the legislature's revealed design." *Id.* at 116 (quoting *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257 (1995)). We thus conclude that even if the BOP regulations pass the first prong of the *Chevron* analysis, they fail to meet the second.

Of course, *Chevron* and its progeny recognize the wide deference granted to agencies such as the BOP in administering their governing statutes, and we are well aware of the expertise of the Bureau of Prisons in matters concerning prison administration and inmate placement. However, we are also mindful that the Bureau cannot depart from the clearly expressed intent of Congress, including its desire that several factors, one of which is the recommendation of a sentencing judge, be considered in placement designations. To accept the BOP's argument would be to ignore that intent as embodied in the statute's plain language and legislative history.

In sum, while the BOP does have the discretion to refuse

---

[12]It is not entirely clear to what extent it is appropriate for us to consider legislative history in analyzing a regulation under the first prong of *Chevron*. *See Santiago v. GMAC Mortg. Group, Inc.*, 417 F.3d 384, 387 n.3 (3d Cir. 2005). However, we note both the use of legislative history by the Supreme Court in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 137 (2000), and also the fact that we analyze the relevant regulations under both prongs of the *Chevron* analysis.

22

to place Woodall in a CCC for the last six months of his sentence, the exercise of that discretion must be based, at least in part, on the § 3621(b) factors.[13]

### F. *The Dissent's Temporal Limitation Arguments*

The dissent argues that the § 3621(b) factors need not be considered by the BOP until an inmate transfer is "actually considered." We disagree. First, this argument ignores the fact that in promulgating the 2005 regulations, the BOP did "actually consider" the question of CCC placement. The BOP "considered" the appropriateness of more lengthy CCC placements for all current and future inmates, and did so without properly acknowledging the factors specifically designated by Congress in §3621(b). *See Baker*, 2005 U.S. Dist. LEXIS 23468, at *15 ("[A]lthough the BOP is not required to transfer a prisoner at any specific time, it is required to make decisions regarding transfer considering the statutory factors. A blanket failure to consider such factors and exercise discretion accordingly thus violates the statute and its underlying policy.").

The dissent cites *Yip*, 363 F. Supp. 2d at 552, in addition to other cases, for the proposition that the BOP has simply identified a category of prisoners – those not yet required by § 3624(b) to be considered for CCC transfers – and "created a rule denying transfer to all of them." But in denying transfer to inmates generally, the BOP clearly considered the question of transfer to begin with. It did so, we think in error, without reference to the mandatory § 3621(b) factors. Those factors cannot all be considered in a blanket promulgation.

Second, we believe that the dissent takes a crabbed view

---

[13]Woodall also asserts that the new regulations violate the Due Process and Ex Post Facto Clauses of the Constitution. We do not need to reach these issues and decline to address them under the principles set forth in *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

of the BOP's governing statute. The statute as a whole, if it is to have practical effect, indicates that the factors enumerated must be considered in making determinations regarding where to initially place an inmate, as well as whether *or not* to transfer him. As is persuasively articulated in *Lesnick v. Menifee*, 2005 U.S. Dist. LEXIS 23183, Congress "express[ed] an intent regarding the *process* by which the BOP should designate inmates to CCCs." *Id.* at *11 (emphasis added) (citing *Goldings*, 383 F.3d at 28). The congressional intent here is clear: determinations regarding the placement scheme – including where a prisoner is held, and when transfer is appropriate – must take into consideration individualized circumstances. The statute requires an individualized process that cannot possibly occur under the dissent's narrow interpretation.[14]

The dissent falls back on the language of § 3624(c) and argues that when the lesser of six months or ten percent of an inmate's sentence remains, and only then, the BOP must consider the § 3621(b) factors. However, § 3624 does not determine when the BOP should *consider* CCC placement, but when it must *provide* it. The clear language of § 3624(c) mandates that the BOP "shall" assure that a prisoner is given appropriate pre-release conditions that are focused on re-entry, if "practicable." The statute requires the BOP not just to consider, but to actually *place* an inmate in a CCC or like facility, during the last ten percent or six months of the sentence, when that is possible. Under the dissent's rationale, the temporal references in § 3624(c), which were meant to create an obligation regarding CCC placement, swallow the central provisions of § 3621(b). These § 3621(b) provisions were meant to guide the transfer scheme more generally.

In short, we conclude that the § 3621(b) factors apply to BOP determinations regarding whether or not initial placements or transfers are appropriate. We thus do not find that the factors

---

[14]Essentially, the dissent argues that the BOP need not consider the statutory factors unless it has basically made a transfer decision or is required to make such a decision. Under that interpretation, the factors would often be surplusage. Any time the BOP considered a transfer but denied it, it could ignore the § 3621(b) factors entirely.

are limited by the temporal references in § 3624.

*V. Woodall's Remedy*

We have held that the BOP may transfer an inmate to a CCC or like facility prior to the last six months or ten percent of his sentence. In exercising its discretion in this matter, the BOP must consider the factors set forth in § 3621(b). However, that the BOP may assign a prisoner to a CCC does not mean that it must. Therefore, the appropriate remedy is an order requiring the BOP to consider – in good faith – whether or not Woodall should be transferred to a CCC. In making this decision, the BOP should consider the sentencing judge's recommendation and the other § 3621 factors, as well as any other appropriate factors the BOP routinely considers. This should be done without reference to the BOP's 2002 and 2005 policies. It should also be done immediately given that Woodall's six-month CCC placement would already have started. As noted above, Woodall is scheduled to be transferred to a CCC in January, and to be released on April 3, 2006. Accordingly, we will vacate the District Court's order and remand with instructions to grant the writ of habeas corpus conditioned upon the BOP's immediate reconsideration of the decision as to whether to transfer Woodall to a CCC under the § 3621 factors. The mandate shall issue forthwith.


FUENTES, Circuit Judge, dissenting.

I agree with the majority that the District Court had jurisdiction in this case under 28 U.S.C. § 2241, and that 18 U.S.C. § 3621(b) requires the BOP to consider each of the factors listed in that statute in designating the place of an inmate's imprisonment or transfer. However, I dissent from the majority's invalidation of the BOP's February 2005 regulation because I find that the § 3621(b) factors need not be considered by the BOP until an inmate is actually considered for a transfer, and that the BOP is not required to consider any inmate for transfer to a CCC until the lesser of six months or ten percent of an inmate's sentence remains.

25

Under the language of § 3621(b), the BOP "*may*" designate an inmate to any approved facility at any time, and as the majority convincingly explains, the agency *must* consider the listed factors when it makes a designation. The statute does not require the BOP to make or consider such a designation at any particular time, however. The only relevant temporal requirement arises in 18 U.S.C. § 3624(c), which requires the BOP

> to the extent practicable, [to] assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community.

Thus, when the lesser of six months or ten percent of an inmate's sentence remains, the BOP must consider that inmate for transfer, and in doing so, must consider each of the factors listed in § 3621(b). Until that point, however, the BOP may categorically preclude the consideration of any inmate for CCC transfer without reference to the § 3621(b) factors, under the Supreme Court's holding in Lopez.[15]

---

[1]The majority argues that in promulgating the 2005 regulation, the BOP considered transfers as to *all* inmates, and was therefore required to take the § 3621(b) factors into account. The text of § 3621(b) clearly relates to individual prisoner placement decisions rather than general regulations, however. See § 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility . . . ."). This language does not speak one way or the other to the permissibility of a blanket prohibition on all inmate transfers for a certain time period.

Relatedly, the majority suggests that to effectuate congressional intent, § 3621(b) must be read broadly to require the BOP to consider individualized circumstances whenever inmate placement is in any way implicated. The plain language of the statute simply does not support such a reading. The requirement that the BOP consider the § 3621(b) factors is

26

The February 2005 BOP regulation has not yet been considered by another circuit court, but several district courts have relied on this reasoning in upholding the regulation. See, e.g., Yip v. Fed. Bureau of Prisons, 363 F.Supp.2d 548, 552 (E.D.N.Y. 2005) ("[A]ssuming arguendo that there were a requirement that the BOP make individual determinations when transferring inmates, it would apply only when the BOP has elected to consider whether to make a transfer. Nothing in Section 3621(b) requires the BOP to consider transferring any inmate under its custody prior to the point identified in 18 U.S.C. 3624(c)."); id. ("The BOP has identified a category of prisoners – inmates who are not yet required to be considered for transfer to a CCC under Section 3624(c), but are eligible under Section 3621(b) – and created a rule denying transfer to all of them, in conflict with no identified directive of Congress."); Levine v. Menifee, No. 05-1902, 2005 WL 1384021, at *5 (S.D.N.Y. Jun. 9, 2005) ("Because the BOP is under no obligation to consider transferring any inmate to any facility under § 3621(b), it is reasonable to conclude that the BOP is not prohibited from excluding certain categories of inmates from such consideration as long as the categorization is not on the basis of social or economic status."); Charboneau v. Menifee, No. 05-1900, 2005 WL 2385862, at *4 (S.D.N.Y. Sept. 28, 2005) (noting that § 3621(b) does not require the BOP "to consider transferring petitioner to a CCC before the 10% date mandated by 18 U.S.C. § 3624(c)"); Harris v. Fed. Bureau of Prisons, No. 05-323, 2005 WL 2562970, at *10 (D.N.J. Oct. 6, 2005) ("[N]othing in § 3621(b) requires the BOP to consider transferring any federal prisoner in its custody before the transitional point set forth in 18 U.S.C. § 3624(c)."). See also Goldings v. Winn, 383 F.3d 17, 33 (1st Cir. 2004) ("Even if the statutory criteria for making assignments and transfers could be read to guarantee some sort of individualized treatment, it is apparent to me that BOP would still have the authority to make a categorical rule excluding some or

_____

triggered only when the BOP "designate[s] the place of the prisoner's imprisonment", and §3621(b) says nothing about when such a designation must be made. The statute therefore cannot be read to preclude a general temporal limitation on inmate transfers.

all CCC placements, except as required for end of sentence placements governed by § 3624(c).") (Howard, J., concurring in decision to strike down December 2002 BOP policy).

I join these courts in concluding that the February 2005 BOP regulation is valid because the agency need not consider the § 3621(b) factors until the lesser of six months or ten percent of an inmate's sentence remains. I also find that petitioner's Due Process and Ex Post Facto claims are without merit and require no further discussion. For these reasons, I would affirm the holding of the district court denying the petition for habeas and mandamus.