

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-18-2007

# Mansfield v. Beeler

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-2240

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Mansfield v. Beeler" (2007). *2007 Decisions*. Paper 926.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/926

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-2240

CLYDE E.L. MANSFIELD,
                                                    Appellant

v.

WARDEN ART BEELER, Federal
Medical Center, Butner, NC
_____

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civ. No. 05-cv-00508)
District Judge: Honorable Malcolm Muir
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
March 27, 2007
Before: Barry, Chagares and Roth, <u>Circuit Judges</u>.

(Filed June 18, 2007)
_____

OPINION
_____

PER CURIAM

        In 1984, Clyde Mansfield was convicted of murder by an Air Force court martial

and sentenced to life imprisonment. After a successful appeal, Mansfield was again

convicted of murder and re-sentenced to life imprisonment. His sentence commenced on

April 24, 1987, with credit for 1,216 days of time served during his criminal proceedings.

In 1996, the Air Force Clemency Board reduced Mansfield's sentence from life imprisonment to 99 years. In 2000, the Clemency Board further reduced his sentence to 98 years.[1]

In 1995, Mansfield was transferred to the custody of the Federal Bureau of Prisons and confined at the United States Penitentiary, Lewisburg, Pennsylvania ("Lewisburg"), where he currently resides. In August 1995, the United States Parole Commission ("the Commission") conducted an initial parole hearing for Mansfield. The Commission declined to set a release date for Mansfield and, pursuant to 28 C.F.R. § 2.12(b), scheduled a 15-year reconsideration hearing for him in 2010.

Beginning in January 1997, Mansfield was employed at the Unicor Federal Prison Industry at Lewisburg. In April 2000, Mansfield was transferred from Lewisburg to the United States Medical Center for Federal Prisoners in Springfield, Missouri, for medical treatment. In October 2001, he was transferred to the Federal Medical Center in Butner, North Carolina ("Butner"), to continue his treatment. On June 1, 2004, he was returned to Lewisburg where, within months, he resumed working for Federal Prison Industries.

In 2004, while Mansfield was at Butner, he filed this petition for habeas corpus under 28 U.S.C. § 2241 in the United States District Court for the Eastern District of North Carolina. When he was transferred back to Lewisburg his habeas petition was

---

[1]During the pendency of this action, the Clemency Board ordered a further reduction to 97 years.

transferred to the United States District Court for the Middle District of Pennsylvania. In his petition, Mansfield claimed that he was entitled to an earlier release because he had been denied good time credit and the Commission had failed to set a mandatory parole date. The District Court denied his petition, finding that "[t]here is no indication that Mansfield has been denied any good conduct credit to which he is entitled by law." (App. at 4.) The District Court further found that his claim regarding the Commission's failure to set a mandatory parole date was premature because, under 18 U.S.C. § 4206(d) (repealed), his mandatory parole date would occur in 2014, after his reconsideration hearing. Mansfield appealed.

We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of a District Court's decision to dismiss a § 2241 petition is plenary. See Cradle v. U.S. ex rel. Miner, 290 F.3d 536, 538 (3d Cir. 2002).

## I.

Under Article 58 of the Uniform Code of Military Justice, 10 U.S.C. § 858(a), military prisoners serving their sentences "in a penal or correctional institution not under the control of one of the armed forces are subject to the same discipline and treatment as persons confined or committed by the courts of the United States." Courts interpreting § 858(a) have "consistently held that a military prisoner who is committed to the service of his sentence in a federal penitentiary automatically becomes entitled to any advantages and subject to any disadvantages which accrue to the civilian prisoner." Stewart v.

3

United States Bd. of Parole, 285 F.2d 421, 421-22 (10th Cir. 1960)(internal quotations omitted). Mansfield claims that he is being denied the advantages that he is entitled to as a prisoner under civilian authorities. He argues that he has been denied good time credit because his good time credit is being awarded by military rather than civilian authorities in violation of § 858(a).

Pursuant to BOP policy, as a military inmate, Mansfield's sentence computations and good time credit are administered by the Army Disciplinary Barracks ("ADB"). BOP Program Statement, Administration of Sentence for Military and Coast Guard Inmates, No. 5110.14, 1 (2000). Currently, Mansfield has been credited with 11,760 days of Military Good Time credit and been awarded 386 days Military Abatement Good Time credit by the ADB. Mansfield argues that Program Statement 5110.14 is invalid because it conflicts with § 858(a) and that, as a result, his good time credit awards should be adjusted upwards to conform with BOP regulations governing its award. Because we find that Mansfield would not have received more good time credits had they been awarded under BOP regulations, we need not decide whether he is correct in his contention that Program Statement 5110.14 is invalid.

Military Good Time credit, like statutory good time under 18 U.S.C. § 4161, is accumulated at a rate of 10 days per month. Thus, there is no difference to his sentence whether he is awarded Military Good Time Credit or Statutory Good Time Credit.

4

Military Abatement Good Time Credit, which is similar to Extra Good Time Credit under 18 U.S.C. § 4162, is awarded at the discretion of the ADB on the basis of employment with the prison industries. Mansfield argues that, because he is serving his sentence under the jurisdiction of the BOP, he should be awarded Extra Good Time Credit in the same manner as prisoners who were sentenced by civilian courts. Specifically, he claims that, instead of earning Military Abatement Good Time Credit, he should have been earning Industrial Good Time Credit under 28 C.F.R. § 523.14. He claims that, under the procedures for awarding Industrial Good Time Credit, he would have earned 641 days of good time credit at the time he filed his petition, instead of the 386 he was awarded by the ADB.

The difference turns on whether Mansfield was entitled to any credit for the time he spent in medical treatment facilities between 2000 and 2004, for which he was not awarded any Military Abatement Credit but, he argues, was entitled to Industrial Good Time Credit. Because he was not entitled to any Industrial Good Time Credit for the years he spent in medical facilities where he was not working in any prison industry, we need not decide whether the BOP or ADB should determine his good time awards.

Industrial Good Time Credit is a form of extra good time for prisoners employed by Federal Prison Industries. See 28 C.F.R. § 523.14. Industrial Good Time Credit "is automatically awarded, beginning on the first day of such employment, and continuing as long as the inmate is employed by Federal Prison Industries." Id. Industrial Good Time

5

Credit, like all extra good time, "is not automatically discontinued while an inmate is hospitalized, on furlough, out of the institution on a writ of habeas corpus, or removed under the Interstate Agreement on Detainers." 28 C.F.R. § 523.17(g). Rather, the award of Industrial Good Time Credit "may be terminated or disallowed during such absences if the Warden or Disciplinary Hearing Officer finds that the inmate's behavior warrants such an action." Id. Mansfield argues that, because no action was taken to terminate his status as earning Industrial Good Time Credit, he continued to earn the credit for the four years that he was hospitalized in Missouri and North Carolina.

Mansfield errs in assuming that his earning status would have been governed by § 523.17(g). Rather, when he was transferred from Lewisburg, his earning status would have been governed by § 523.17(e), which governs the earning status of inmates transferred between institutions.[2] Where, like in Mansfield's case, an inmate is transferred to another prison or a medical center, "the extra good time is terminated upon arrival." Id. If, again like Mansfield, the inmate is not employed by Federal Prison Industries in the new institution, then extra good time will only be awarded if a review by the prison staff finds that the inmate is eligible for meritorious good time.[3] Id. Because

---

[2]Mansfield's medical treatment was not a brief hospitalization, similar to a furlough or being out of the institution on a writ of habeas corpus, rather he was transferred to other penal institutions where he spent four years.

[3]The record indicates that he was awarded at least 43 days of Military Abatement Good Time credit as a lump sum during the time that he was hospitalized; presumably for some meritorious action. See (Supp. Br. in Response to Mot. to Dism. Ex. B4).

6

Mansfield was transferred from Lewisburg to a different correctional facility and because he stopped working for Federal Prison Industries during his four year hiatus from Lewisburg, he would not have been earning Industrial Good Time Credit. Accordingly, even under his preferred reading of the law, Mansfield is not entitled to relief.

II.

Mansfield claims that he has been unlawfully denied a mandatory parole date and that, as a result, he has been housed in maximum security prisons rather than in less harsh confines that his sentence warrants. Further, he claims that the fact that he was transferred to a maximum security prison when he was taken into BOP custody violated the Ex Post Facto clause. Neither of these contentions is persuasive.[4] See Woodall v. Federal Bureau of Prisons, 432 F.3d 235, 244-45 (3d Cir. 2005).

Under 18 U.S.C. § 4206(d)(repealed), a federal prisoner will be released on mandatory parole unless the Parole Commission "determines that he has seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he will commit any Federal, State, or local crime." For an inmate serving a life sentence or greater than 45 years, the mandatory parole date comes after serving

---

[4]Mansfield's claims that the transfer to BOP custody led him to be housed in a more restrictive prison violated the Ex Post Facto clause fails because § 858(a), which authorized his transfer to civilian custody, predates his criminal conduct by nearly thirty years. Thus, there is no retroactive application of law involved in this case.

two-thirds of his sentence or 30 years, whichever is earlier.[5]  Because Mansfield's

sentence is 97 years, his mandatory parole comes after 30 years.  Mansfield was

sentenced on April 24, 1987, and credited with 1,216 days of jail time credit after his

overturned conviction.  Thus, Mansfield's mandatory parole date will occur in July 2014.

The Government concedes that § 4206(d) applies to Mansfield and that his

mandatory parole date occurs in July 2014.  (Appellee Br. at 28.)  Accordingly, there is no

real disagreement between the Government and Mansfield about the existence and timing

of his mandatory parole.  The disagreement revolves around the supposed effects of

Mansfield's mandatory parole date on his current incarceration.

Mansfield's complaint stems from the fact that his mandatory parole date does not

appear on his sentence computation prepared by the ADB.  He claims that the absence of

this date on his sentence computation has led the BOP to assign him a high security level.

As a result, he was placed in a maximum security prison where his conditions of

confinement were much harsher than they were when he was in military custody.[6]

---

[5]§ 4206(d) states "Any prisoner . . . shall be released on parole after having served two-thirds of each consecutive term or terms, or after serving thirty years of each consecutive term or terms of more than forty-five years including any life term, whichever is earlier: Provided, however, That the Commission shall not release such prisoner if it determines that he has seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he will commit any Federal, State, or local crime."

[6]At the time Mansfield filed his habeas petition, he was at a medical facility in Butner and his security level classification did not appear to affect his conditions of confinement.

However, he provides no reason to believe that the absence of a mandatory parole date has had any impact on his security level classification and the BOP's procedures for assigning inmates to prisons do not involve mandatory parole dates. The presence or absence of a mandatory parole date in his sentence computation does not affect his custody level.

The designation of the type of prison in which an inmate will serve his sentence – the inmate's custody level – is generally determined by an inmate's security level; which, in turn, is affected by the presence of "public safety factors." BOP Program Statement, Security Designation and Custody Classification Manual, No. 5100.08 Ch. 5 7-13 (2006). The public safety factors include "relevant factual information regarding the inmate's current offense, sentence, criminal history or institutional behavior that require[] additional security measures be employed to ensure the safety and protection of the public. is itself." Id. at 7. In Mansfield's case, the predominant factor appears to have been the length of his sentence. In the absence of public safety factor waiver, "a male inmate with more than 30 years remaining to serve [on his sentence] will be housed in a high security level institution." Id. at 10. When Mansfield was initially transferred to BOP custody, he was serving a life sentence, and thus had more than 30 years remaining to serve. Even after his clemency, he still has more than 40 years remaining on his sentence before his statutory release.

Mansfield claims that, rather than using his statutory release date – the day upon which he will have served his entire sentence minus the good time credit he has earned –

BOP was required to apply his mandatory parole date in its calculation of his length of sentence public safety factor. Mansfield provides no reason or authority for this claim, and it is contradicted by BOP's policies. According to regular BOP policy, sentence length is usually calculated based on sentencing documents or statutory release dates, not anticipated parole. See BOP Program Statement, Sentence Computation Manual/Old Law/Pre CCCA 1984, No.5880.30 VII 1-3 (1999). BOP followed this standard procedure when assigning Mansfield to a maximum security prison, and including his mandatory parole date in his sentence computation would have led to no change in the result.[7]

Because Mansfield has received all of the good time credit that he is entitled to and because has not shown that the lack of a mandatory parole date on his sentence computation affected his custodial status, we agree that his petition should be denied. Accordingly, we will affirm the District Court.

10

---

[7]Further, Mansfield appears to have received a public safety factor waiver in response to his most recent request to be moved to less restrictive custody. This request was made while at the medical facility in Butner. (Supp. Resp. to Mot. to Dism. at 31.) There is no evidence in the record whether, once he was transferred back to Lewisburg, his custody level had changed.