**REVISED July 31, 2017**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-30129

United States Court of Appeals
Fifth Circuit

**FILED**

July 28, 2017

Lyle W. Cayce
Clerk

CARLOS POREE,

> Petitioner - Appellant

v.

KANDY COLLINS,

> Respondent - Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, ELROD, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Appellant Carlos Poree is an insanity acquittee who has been in the custody of the Eastern Louisiana Mental Health System (ELMHS) since 1999. After a state court denied Poree conditional release to Harmony House Transitional Center ("Harmony House"), Poree sought federal habeas relief under 28 U.S.C. § 2254. The district court denied his claim. Although we are troubled that the state court seemingly failed to follow Louisiana state law in denying Poree relief, we cannot conclude that the state court decision was contrary to clearly established Supreme Court law. We thus AFFIRM.

No. 14-30129

## I.

"On November 7, 1977, Carlos Poree shot ten people, killing one."[1] His first trial resulted in a mistrial, and his second trial—limited to whether Poree was not guilty by reason of insanity ("NGBRI")—resulted in a first degree murder conviction.[2] After making his way through the state court appellate system,[3] Poree filed a federal habeas petition in 1997,[4] which the district court granted.[5] Upon a hearing, Poree was committed to ELMHS.

## A.

Since Poree began living at ELMHS, the state court has considered several times whether he could transfer to a less restrictive setting. According to Louisiana law, the process begins when the superintendent of the mental institution recommends discharge or release to a review panel, which then makes a recommendation to the court.[6] "If the review panel recommends to the court that the person be discharged, conditionally or unconditionally, or placed on probation, the court shall conduct a contradictory hearing following notice to the district attorney."[7] If a contradictory hearing is held, "the burden shall be upon the state to seek continuance of the confinement by proving by clear and convincing evidence that the committed person is currently both mentally ill and dangerous."[8]

---

[1] *Poree v. Cain*, No. CIV.A. 97-1546, 1999 WL 518843, at *1 (E.D. La. July 20, 1999).

[2] *Id.*

[3] *See id.* (summarizing Poree's appeal to Louisiana Supreme Court, which first reversed, but then reaffirmed conviction and sentence, and Poree's unsuccessful request for post-conviction relief in state trial court).

[4] *Id.*

[5] *Id.* at *8.

[6] LA. CODE CRIM. PROC. ANN. art. 655(A). The committed person may also apply for release. *Id.* at art. 655(B).

[7] *Id.* at art. 655(A). *But see id.* at art. 657 (suggesting court has discretion to either continue commitment or hold hearing).

[8] *Id.* at art. 657. Article 657 cites to LA. STAT. ANN. § 28:2(3) and (4) to define dangerousness:

2

No. 14-30129

Poree has been through this process several times. Between 2002 and 2009, the state held three hearings, denying Poree transfer each time.[9] In 2010, the process began again. On October 11, 2010, the ELMHS Forensic Review Panel, made up of Dr. John W. Thompson,[10] Dr. F.J. Bordenave,[11] and Dr. David Hale,[12] completed a Review of Patient Status ("Review") for Poree and recommended that Poree be conditionally released to Harmony House. The Review indicated that Poree is aware of the nature of his violent offense, has the ability to conform his conduct to the law, and has "sufficient moral cognitive judgment to distinguish between right and wrong." His Axis I diagnosis was listed as Schizophrenia, Residual Type. Noting Poree's psychiatric history and his past homicidal and assaultive behaviors, the Review nevertheless stated that Poree's symptoms are well-maintained with current medication, and that Poree is fully compliant with his treatment. The Review further indicated that Poree is currently mentally ill but in stable remission, is not currently dangerous to self or others if adequately supervised, and "may be granted Conditional Release and placed in appropriate community setting with tracking, monitoring and supervision." The Review Panel's opinion that Poree should be conditionally released to Harmony House

---

(3) "Dangerous to others" means the condition of a person whose behavior or significant threats support a reasonable expectation that there is a substantial risk that he will inflict physical harm upon another person in the near future.

(4) "Dangerous to self" means the condition of a person whose behavior, significant threats or inaction supports a reasonable expectation that there is a substantial risk that he will inflict physical or severe emotional harm upon his own person.

[9] After an October 29, 2002 hearing, the state court denied Poree a transfer to Harmony House. At an October 18, 2007 hearing, the state court denied Poree a transfer from the forensic division of ELMHS to the less restrictive civil side. At a June 23, 2009 hearing, the state court again denied a transfer to the less restrictive civil side.

[10] M.D., Chairperson, psychiatrist and chief of staff of ELMHS.

[11] M.D., Review Panel Member, and Poree's treating physician.

[12] Ph.D., Review Panel Member.

No. 14-30129

included a list of stipulations, including that violations may result in his return to ELMHS.

On January 18, 2011, a state district court held a hearing to determine whether Poree should be conditionally released to Harmony House upon the hospital's recommendation. At the time of the hearing, Poree was 68- or 69-years old and resided in the least restrictive unit in the forensic division of ELMHS. Four witnesses testified: Dr. Bordenave, Dr. Thompson, and Ralph Griffin testified as defense witnesses, and Dr. Richard Richoux testified as a State witness (with Dr. Raphael Salcedo, another State witness, concurring).

Dr. Bordenave—an expert forensic psychiatrist, Poree's treating physician since July 2010, and head of Mr. Poree's treatment team—testified that Poree appears to have been in remission for years, is compliant with his medications, and that there is no evidence that Poree currently suffers from delusions. Dr. Bordenave noted that Poree understands that he will have to stay on medication for the rest of his life. Dr. Bordenave agreed that stopping medication would likely result in decompensation into mental illness, but that such relapse would not necessarily result in violence or aggression. He further testified that Poree had achieved the maximum recovery level at ELMHS, and that Harmony House has the structure for Poree to successfully continue treatment. In a letter to the court, Dr. Bordenave stated that Poree has "been best described as a model patient." He further stated, "both psychological actuarial testing and observation and treatment by his treatment team, indicate that he is a relatively low risk for violent re-offense." Dr. Bordenave concluded that "Poree would likely be one of the better, more appropriate clients served at Harmony."

Dr. Thompson—an expert forensic psychiatrist, chief of staff of ELMHS, and a Vice Chair of the Department of Psychiatry at Tulane—has worked with Poree since Poree arrived at the hospital. Dr. Thompson testified that Poree

4

receives treatment in the forensic unit, with the eventual goal being to safely move him into either a group home or the community. Dr. Thompson agreed that Poree had achieved the treatment goals set for him in the forensic unit, and that Poree did not require continued hospitalization in the forensic unit to prevent him from becoming dangerous. Dr. Thompson explained that in making its recommendation, the Review Panel relied on instruments such as the "COT readiness profile"[13] and the "Hare's psychopathy."[14] Dr. Thompson believed that Poree would comply with the conditions at Harmony House. Dr. Thompson considered Poree to be mentally ill, but opined that "he's not a danger to self or others if placed in the Harmony setting with the restrictions that we have."

On cross-examination, Dr. Thompson noted Poree's smiling while Dr. Thompson and Poree discussed Poree's offense. Dr. Thompson recounted Poree's statement: "Well, you know, it's been such a long time. It's been thirty years and, you know, knowing how I am now it's hard to believe that I was that kind of person that would do something like that." Dr. Thompson concluded that the smiling could be "[Poree's] explanation of what happened," as in, "'It's been so long ago it's hard for me to look back and think that I actually did those things,'" or a residual symptom of his schizophrenia.[15] Dr. Thompson acknowledged that medications can stop working, and that even with medication, someone with schizophrenia can decompensate. Dr. Thompson noted that Poree had never decompensated while on medication. As for

---

[13] The COT readiness profile "looks at how the person accepts their mental illness, whether they're engaged in treatment, that they actively participate, come to groups and things like that." A score of "[t]hirty-four or less is someone [the panel] consider[s] for a community placement." Mr. Poree scored a twenty.

[14] On the Hare's psychopathy, Poree scored "extremely low . . . and also in the range where [the panel] would consider people for community placement."

[15] Dr. Bordenave acknowledged that nurses had reported Poree smiling, but that Poree claimed the smiling was due to something on TV.

delusions, Dr. Thompson indicated that Poree is not reporting such symptoms nor are they seeing them behaviorally.

Mr. Griffin is the facility manager of Harmony Transitional Center, and he had worked for Harmony for twenty-four years at the time he testified. He interviewed Poree as a potential resident and pre-accepted him into Harmony House. Mr. Griffin testified to the qualities he found that would make Poree an appropriate resident:

> [W]e recognized that he had an insight into his mental illness. He was very remorseful and understood the crime that he committed. He had been stable, you know, for a period of time. We normally receive a preplacement packet of the client's history. And, through our review of that packet, as well as face to face interview, we recognized, from 2005 at least, that there was any incident . . . . And we recognized that he hadn't displayed any aggression behaviors. And he's been consistently taking his medication to have him stable.

Mr. Griffin stated that he did not have safety concerns regarding Poree.

Dr. Richoux, an expert forensic psychiatrist, was called as a state witness. Dr. Richoux met with Poree on the day of the hearing to update his impression and give an opinion regarding the transfer recommendation. Dr. Richoux had known of Poree since the late 1970s, and had probably seen Poree ten times between 1999 and the hearing date; his most recent examination of Poree was in June 2010. Dr. Richoux testified that Poree has a long-standing schizophrenia diagnosis, that Poree has shown "excellent stabilization of his symptoms" while on medication, and that he is asymptomatic on a short-term basis. Dr. Richoux identified as a concern Poree's insight into his own illness, but noted development over the years. Richoux indicated, "as of now having had the opportunity to observe him over many years, Mr. Poree is about as well stabilized as a person can be who suffers from a major mental illness." Dr. Richoux stated that Poree now understood that if he stopped his medication,

there would be a high likelihood of relapse into psychotic symptoms, "be those accompanied by violent behavior or not, but certainly that he would have a high risk of reemergence of violent behavior in connection with psychotic symptoms were he to stop his treatment." Dr. Richoux concluded that he would recommend, along with Dr. Salcedo, "that Mr. Poree does seem to be an appropriate candidate for transfer . . . He seems to have a very evenhanded, realistic view of things at this point. Sees the need for treatment. To be expected to comply with treatment I believe."

When asked, "based on [Poree's] history of psychotic symptoms were to reemerge, would he be a danger to himself or others," Dr. Richoux agreed to a "possibility of that." Dr. Richoux could not say how probable that was, "because of, for one thing, his age at this point." He explained, "generally speaking, as people get older their propensity for violent behavior becomes a little less and a little less as time goes by," but still noted the possible risk of violence. He also noted the possibility of a "breakthrough of symptoms" for people taking medication. When questioned by the judge about the possibility of relapse when introduced to external stimuli, Dr. Richoux agreed, "[t]here's always going to be a possibility of relapse," but clarified, "[s]chizophrenia itself is not particularly sensitive to external stresses."

Dr. Salcedo, stipulated as an expert in forensic psychology, concurred with Dr. Richoux.

**B.**

Harmony House is a forensic transitional facility originally established for people found NGBRI. Patients may eventually be released into society. Harmony House has many residents with schizophrenia. Residents begin with few privileges but are allowed more privileges as they progress. The average length of stay at Harmony House is about four years, but it is an individualistic determination and some people do not move beyond Harmony House. Harmony

No. 14-30129

House is a secure facility, and employs tools like magnetic locks controlled by staff and twenty-four-hour staff supervision. The staff completes sixty hours of training every year, "which consists of behavior management, identifying warning signs and possible decompensation changes in behaviors that are required to be reported to the doctor."

Mr. Griffin, the facility manager of Harmony House, testified that Poree would begin Harmony House at the "entry secure level." Mr. Griffin confirmed that Poree would have access to counseling services. Dr. Bordenave testified that Harmony House would be aware of Poree's medication regimen, and Mr. Griffin explained: "If they take medicine in the form of injections we bring them to Baton Rouge Mental Health. The staff is actually there with the client as he receive[s] the injection. We receive paperwork signed by the doctor that the injection has been provided."[16] Mr. Griffin further testified to the procedures in case Poree's symptoms returned or he failed to take his medication.

## C.

After testimony and arguments at Poree's hearing, State Judge Camille Buras ruled from the bench. Judge Buras first recounted the facts of Poree's 1977 crime, and then stated her finding that Poree still suffers from a mental illness. As for dangerousness, Judge Buras referred to a standard of potential danger:

> The question being whether or not Mr. Poree is a danger to himself and/or to others and whether or not it has been proven that he is a danger to himself and to others by clear and convincing evidence . . . .

> [T]his Court is in a position, again, to protect the public from those cases where the Court's opinion being that the hospital is trying to transition Mr. Poree to his eventual release. And this Court is not,

---

[16] Mr. Griffin also noted an alternative method of a psychiatrist at the facility administering the injection.

No. 14-30129

and has not in the past, been satisfied that Mr. Poree does not present a *potential* for both danger to himself and to others.

The Court finds that the danger is inherent in the activity and the conduct that occurred in 1977 and the months, and even years, preceding the manifestation of the illness by the shooting of ten people and the killing of one . . . .

Just because, as Dr. Richoux said, the symptoms are not manifesting and someone is asymptomatic, that does not negate the diagnosis. And, in this Court's opinion, does not negate the *potential* that Mr. Poree, should he transition into a less restrictive setting, would not manifest or relapse into the delusions and/or the behavior that presented itself through the years. . . .

The law says if the defendant still has a major, mental illness and presents as a *potential* danger to himself or to others -- and that's been proven by clear and convincing evidence -- the Court may maintain its continued confinement of Mr. Poree.[17]

Judge Buras denied Poree's transfer to Harmony House and ordered that Poree remain in custody of the ELMHS Forensic Division with an annual review.

Poree challenged the ruling by filing an original writ in the Louisiana appellate court, which was denied, and denied again by the Louisiana Supreme Court.[18] Thereafter, Poree petitioned the United States District Court for a writ of habeas corpus. The magistrate judge issued a report and recommendation denying an evidentiary hearing and the habeas petition. Over Poree's filed objections, the district court adopted the magistrate's report. The district court dismissed Poree's habeas petition with prejudice and denied a Certificate of Appealability ("COA"). This Court granted a COA, and Poree now appeals.

---

[17] Emphases added.
[18] *State v. Poree*, 71 So. 3d 323 (La. 2011).

9

No. 14-30129

## II.

Before proceeding to the merits of Poree's claim, we pause to address whether Poree's claim properly sounds in habeas. Typically, habeas is used to challenge the fact or duration of confinement, and 42 U.S.C. § 1983 is used to challenge conditions of confinement. However, "[t]he line between claims which must initially be pressed by writ of habeas corpus and those cognizable under § 1983 is a blurry one."[19] Although Poree's claim defies easy categorization, we find it was properly brought in habeas. In short, Poree challenges the fact of his confinement at the Forensic Division of ELMHS, for which habeas relief may be sought.

Both 28 U.S.C. § 2254[20] and 42 U.S.C. § 1983[21] offer relief to those improperly confined by the government.[22] Which statutory vehicle to use depends on the nature of the claim and the type of relief requested,[23] the instructive principle being that challenges to the fact or duration of confinement are properly brought under habeas,[24] while challenges to the

---

[19] *Cook v. Tex. Dep't of Criminal Justice Transitional Planning Dep't*, 37 F.3d 166, 168 (5th Cir. 1994).

[20] 28 U.S.C. § 2254(a) states: "The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

[21] 42 U.S.C. § 1983 states in relevant part: "Every person who, under color of any statute . . . of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

[22] *Muhammad v. Close*, 540 U.S. 749, 750 (2004) (per curiam).

[23] *Compare Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) ("[W]hen a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus."), *with Youngberg v. Romeo*, 457 U.S. 307, 324 (1982) (explaining that the involuntarily civilly committed enjoy a constitutionally protected interest in "reasonably nonrestrictive confinement conditions").

[24] *Preiser*, 411 U.S. at 500; *Wilkinson v. Dotson*, 544 U.S. 74, 81–82 (2005).

conditions of confinement are properly brought under § 1983.[25] While "fact or duration" claims must be brought under habeas, the Supreme Court has not foreclosed the use of habeas for other kinds of claims. Some circuit courts, however, have limited habeas corpus to claims that challenge the fact or duration of confinement.[26] Others have not.[27] Our own Circuit has been less clear,[28] but we need not weigh in on that broader question today.[29] Poree's claim is similar to others that we have found appropriate for habeas relief.

"[R]elease from physical confinement in prison constitutes release from custody for habeas purposes, even though the state retains a level of control

---

[25] *See, e.g.*, *Youngberg*, 457 U.S. at 309; *Wilson v. Seiter*, 501 U.S. 294, 296 (1991).

[26] *Nettles v. Grounds*, 830 F.3d 922, 927 (9th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 645 (2017) (mem.); *see also Palma-Salazar v. Davis*, 677 F.3d 1031, 1035–36 (10th Cir. 2012); *Kruger v. Erickson*, 77 F.3d 1071, 1073 (8th Cir. 1996) (per curiam). The Seventh Circuit has remarked that "[a] number of other court of appeals cases likewise have allowed conditions of confinement to be challenged in an action for habeas corpus, even when, as in this case . . . the challenge could not affect the duration of [the inmate's] confinement even indirectly." *Robinson v. Sherrod*, 631 F.3d 839, 840 (7th Cir. 2011) (citations omitted) (confirming the Seventh Circuit's "long-standing view that habeas corpus is not a permissible route for challenging prison conditions").

[27] *Aamer v. Obama*, 742 F.3d 1023, 1030–38 (D.C. Cir. 2014); *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 241–44 (3d Cir. 2005); *see also Adams v. Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011) (per curiam) (allowing method-of-execution claim to proceed under habeas); *United States v. DeLeon*, 444 F.3d 41, 59 (1st Cir. 2006) ("If the conditions of incarceration raise Eighth Amendment concerns, habeas corpus is available.").

[28] *Compare Carson v. Johnson*, 112 F.3d 818, 820–21 (5th Cir. 1997) (suggesting level of exclusivity between habeas and § 1983 by adopting a "simple, bright-line rule" to determine when § 1983 was the proper vehicle for a claim), *and Rourke v. Thompson*, 11 F.3d 47, 49 (5th Cir. 1993), *with Coleman v. Dretke*, 395 F.3d 216, 219 n.2 (5th Cir. 2004), *pet. for reh'g. denied, and Coleman v. Dretke*, 409 F.3d 665, 670 (5th Cir. 2005) (per curiam) [hereinafter *Coleman II*] ("[N]either the Supreme Court nor this court has held that certain claims must be brought under § 1983 rather than habeas." (citations omitted)).

[29] Some of our sister circuits have suggested that our circuit has, in fact, foreclosed the use of habeas for non-fact or duration claims. *E.g.*, *Spencer v. Haynes*, 774 F.3d 467, 470–71 (8th Cir. 2014) (pointing to *Cook v. Hanberry*, 592 F.2d 248 (5th Cir. 1979) (per curiam), *opinion corrected*, 596 F.2d 658 (5th Cir.)). The revised opinion in *Cook* removed language quoted in *Spencer* but still opined that "[d]amages for the mistreatment alleged could not be allowed in this habeas corpus action; they might be sought in a § 1983 action." 596 F.2d at 660 n.1. We need not revisit *Cook* and its rationale in light of later controlling case law, *e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 779 (2008), as we do not weigh in on the broader issue, nor does *Cook* help answer the immediate question.

No. 14-30129

over the releasee."[30] A request for relief from an initial civil confinement institution to a transitional home is similar.[31] Residence in a transitional home—a condition of Poree's release from ELMHS—bridges the gap between his total confinement and total freedom.[32] We reiterate that we decline to address whether habeas is available only for fact or duration claims. We find only that Poree's claim properly sounds in habeas and that we have jurisdiction to review the district court's order under 28 U.S.C. § 2253(a).

## III.

"We review the district court's findings of fact for clear error and review its conclusions of law de novo, applying the same standard of review to the state court's decision as the district court."[33] "When examining mixed questions of law and fact, we adhere to a de novo standard under which we independently apply the law to the facts found by the district court, as long as

---

[30] *Coleman II*, 409 F.3d at 669 (citations omitted); *see also Boss v. Quarterman*, 552 F.3d 425, 426 (5th Cir. 2008) (habeas relief properly sought in prisoner's appeal of state board's denial of mandatory supervision release); *Malchi v. Thaler*, 211 F.3d 953, 956, 957 n.3 (5th Cir. 2000) (habeas relief properly sought for prisoner's allegation that "disciplinary action resulted in a change in his good-time-earning status which extended the date for his release on mandatory supervision"); *see also Woods v. Chapman*, 239 F. App'x 35, 37 (5th Cir. 2007) (per curiam) (unpublished) ("The declaratory relief Woods seeks is, however, in essence just a challenge to his conditions of parole and thus is properly brought in a habeas corpus proceeding under 28 U.S.C. § 2254." (citation omitted)).

[31] Indeed, Louisiana's statutory scheme likens conditional release to probation. *See* LA. CODE CRIM. PROC. ANN. art. 658 ("When the committed person is released on probation, which shall also be known as conditional release, the clerk of court shall deliver to him a certificate setting forth the period and the conditions of his probation."); LA. CODE CRIM. PROC. ANN. art. 657 ("After the hearing, and upon filing written findings of fact and conclusions of law, the court may order the committed person discharged, released on probation subject to specified conditions for a fixed or an indeterminate period, or recommitted to the state mental institution.").

[32] *Cf. United States v. Mitchell*, 709 F.3d 436, 439 (5th Cir. 2013) (describing federal insanity acquittee's "conditional[] release[] . . . to a residential mental health facility" and later "to a residential treatment facility").

[33] *Higginbotham v. Louisiana*, 817 F.3d 217, 221 (5th Cir. 2016) (emphasis omitted) (quoting *Ortiz v. Quarterman*, 504 F.3d 492, 496 (5th Cir. 2007)), *cert. denied*, 137 S. Ct. 506 (mem.).

the district court's factual findings are not clearly erroneous."[34] Moreover, "[f]ederal habeas proceedings are subject to the rules prescribed by the Antiterrorism and Effective Death Penalty Act (AEDPA)."[35] 28 U.S.C. § 2254(d) directs that a writ of habeas corpus shall not be granted unless the state court[36] adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Because "§ 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning,"[37] there are three ways a federal court can grant habeas relief: (1) if the state court decision was contrary to clearly established Supreme Court law; (2) if the state court decision involved an unreasonable application of clearly established Supreme Court law; or (3) if the state court decision was based on an unreasonable determination of the

---

[34] *Grim v. Fisher*, 816 F.3d 296, 304 (5th Cir. 2016) (citations omitted), *cert. denied*, 137 S. Ct. 211 (mem.).

[35] *Matamoros v. Stephens*, 783 F.3d 212, 215 (5th Cir. 2015) (citing 28 U.S.C. § 2254).

[36] "Under AEDPA, 'we review the last reasoned state court decision.'" *Woodfox v. Cain*, 772 F.3d 358, 369 (5th Cir. 2014) (citation omitted), *cert. denied*, 136 S. Ct. 38 (2015) (mem.). Here, the last reasoned state court decision is the state trial court decision issued from the bench following the January 18, 2011 hearing. The Supreme Court recently granted certiorari in a case that concerns the practice of "looking through" to the last reasoned state opinion, *Wilson v. Warden, Ga. Diagnostic Prison*, 834 F.3d 1227 (11th Cir. 2016) (en banc), *cert. granted sub nom. Wilson v. Sellers*, 137 S. Ct. 1203 (2017), but given the possibility that the Court's ultimate disposition will not affect our "look through" practice, we proceed as our doctrine instructs.

We also note that LA. CODE CRIM. PROC. ANN. art. 657 appears to require that Louisiana courts file "written findings of facts and conclusions of law" following a civil commitment contradictory hearing. Here, the record on appeal contains no written findings of facts and conclusions of law relating to the state trial court's January 18, 2011 hearing and oral decision.

[37] *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citation omitted).

No. 14-30129

facts in light of the evidence presented. "AEDPA's standard is intentionally difficult to meet."[38]

## IV.

Civil commitment is not criminal commitment; unlike a criminal sentence, civil commitment is not a sentence of punishment.[39] The Supreme Court "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."[40] Although Poree's 1977 crime looms over these proceedings, he was adjudicated not guilty by reason of insanity.[41] The task of this Court is to analyze the state court's decision with respect to his ongoing civil confinement under 28 U.S.C. § 2254(d).

## A.

We first analyze whether the state court decision was "contrary to" "clearly established" Supreme Court law. The "'clearly established' phrase [in 28 U.S.C. § 2254(d)(1)] 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"[42] "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."[43] "[T]he lack of a Supreme Court decision on nearly identical facts does not by itself mean

---

[38] *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (citations and internal quotations omitted).

[39] *Jones v. United States*, 463 U.S. 354, 369 (1983) ("Different considerations underlie commitment of an insanity acquittee. As he was not convicted, he may not be punished." (footnote omitted)); *id.* at 373 n.4 (Brennan, J., dissenting) ("The insanity defense has traditionally been viewed as premised on the notion that society has no interest in punishing insanity acquittees, because they are neither blameworthy nor the appropriate objects of deterrence." (citation omitted)).

[40] *Addington v. Texas*, 441 U.S. 418, 425 (1979) (citations omitted).

[41] *Poree*, 1999 WL 518843, at *8.

[42] *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citations omitted).

[43] *Id.* at 71–72.

14

that there is no clearly established federal law, since 'a general standard' from [the Supreme] Court's cases can supply such law."[44] "A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts."[45]

1.

"The starting point for cases subject to § 2254(d)(1) is to identify the 'clearly established Federal law, as determined by the Supreme Court of the United States' that governs the habeas petitioner's claims."[46] The parties dispute what law the Supreme Court has clearly established, though both correctly focus their attention on *Jones v. United States*[47] and *Foucha v. Louisiana*.[48] In *Jones*, the Supreme Court considered whether an NGBRI acquittee must be released from a mental hospital because his hospitalization was longer than his would-be prison sentence.[49] The Court described the purpose of civil commitment generally and the District of Columbia's challenged NGBRI commitment scheme:

> The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous. And because it is impossible to predict how long it will take for any given individual to recover

---

[44] *Marshall v. Rodgers*, 133 S. Ct. 1446, 1449 (2013) (per curiam) (citation omitted).

[45] *Bell*, 535 U.S. at 694 (citation omitted); *accord Chester v. Thaler*, 666 F.3d 340, 347 (5th Cir. 2011) ("A state court's decision is 'contrary to' clearly established federal law if 'it relies on legal rules that *directly conflict* with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts.'" (citation omitted and emphasis added)).

[46] *Marshall*, 133 S. Ct. at 1449 (citations omitted).

[47] 463 U.S. 354 (1983).

[48] 504 U.S. 71 (1992).

[49] 463 U.S. at 356.

– or indeed whether he ever will recover – Congress has chosen, as it has with respect to civil commitment, to leave the length of commitment indeterminate, subject to periodic review of the patient's suitability for release.[50]

The Court then held that an NGBRI acquittee may be confined to a mental institution "until such time as he has regained his sanity or is no longer a danger to himself or society."[51] The length of his would-be prison sentence was irrelevant.[52]

Nine years later in *Foucha*, the Supreme Court analyzed whether a state could continue its civil confinement of an insanity acquittee who was dangerous but no longer mentally ill.[53] The Court held that because Foucha was not mentally ill, "the basis for holding [him] in a psychiatric facility as an insanity acquittee has disappeared, and the State is no longer entitled to hold him on that basis."[54] Notably, the *Foucha* Court characterized the *Jones* holding as: "'(t)he committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous,' *i.e.*, the acquittee may be held as long as he is both mentally ill and dangerous, but no longer."[55] And in response to a dissenting justice,[56] the majority reiterated that *Jones* provided the standards for release of insanity acquittees.[57]

---

[50] *Id.* at 368 (citations omitted).

[51] *Id.* at 370.

[52] *Id.* at 369.

[53] 504 U.S. at 73–75.

[54] *Id.* at 78 (citation omitted).

[55] *Id.* at 77 (quoting *Jones*, 463 U.S. at 368).

[56] *Id.* at 120 (Thomas, J., dissenting).

[57] *Id.* at 79 n.5 ("The issue in [*Jones*] . . . was whether an insanity acquittee 'must be released because he has been hospitalized for a period longer than he might have served in prison had he been convicted,' and in the course of deciding that issue in the negative, we said that the detainee could be held until he was no longer mentally ill or no longer dangerous . . . . We noted in footnote 11 that Jones had not sought a release based on nonillness or nondangerousness, but as indicated in the text, we twice announced the outside limits on the detention of insanity acquittees. The Justice would 'wish' away this aspect of *Jones*, but that case merely reflected the essence of our prior decisions." (internal citations omitted)).

Poree argues that "clearly established . . . Supreme Court law . . . permits the continued detention of an insanity acquittee so long as he remains both mentally ill and dangerous." He contends that there is a "temporal component" to the preconditions of mental illness and dangerousness. Specifically, he asserts that the Court's holdings require *continuing* illness and dangerousness, meaning confinement must end when either condition is resolved. In support, Poree points to language from *Foucha* stating that continued confinement "is improper absent a determination in civil commitment proceedings of *current* mental illness and dangerousness."[58] He argues that the word "current" demonstrates a temporal component to the preconditions. Poree concedes that the Court has not identified the precise scope of the term dangerousness, but argues that the Court "certainly intends that the precondition have meaning." "Specifically," Poree contends, "the Supreme Court intended by the dangerousness precondition to limit the class of mentally ill committees that the state may continue to confine."

The State counters that whether "current[]" dangerousness must be shown "is an issue that has never been clearly established by the Supreme Court." It asserts that Foucha's holding is narrow: NGBRI acquittees may not be confined on the basis of dangerousness alone. The State contends that *Foucha's* references to dangerousness "represent mere dicta rather than 'clearly established' federal law," and that the word "current" modifies only "mental illness" and not "dangerousness." Citing Justice O'Connor's concurring opinion in *Foucha*, the State further argues that *Foucha* was limited to its

---

[58] *Id.* at 78 (emphasis added).

No. 14-30129

facts, and that *Jones*, *Foucha*, and *O'Connor v. Donaldson*[59] do not address, let alone clearly establish, any temporal aspect of dangerousness.[60]

Heeding *Lockyer v. Andrade*'s explication that clearly established law under § 2254(d)(1) refers to Supreme Court holdings and governing principles,[61] the governing legal principle derived from *Foucha* and *Jones* is that a state may continue to confine an insanity acquittee only as long as the acquittee is both mentally ill and dangerous.[62] We agree with the State and the district court that the Supreme Court has not explicitly addressed how a state may make its dangerousness determination; indeed, in *Jones* the Court indicated that the dangerousness finding is predictive in nature and that the government is permitted to protect against the "potential dangerousness" of NGBRI aqcuittees.[63] It has, however, clearly established that a finding of dangerousness is one of two prerequisites to continued civil confinement.

2.

Having identified the clearly established Supreme Court law, we next analyze whether the state court's decision was contrary to it. We hold that it was not. Although the state court's repeated enunciation of a "potential"

---

[59] 422 U.S. 563, 576 (1975) (considering continued civil confinement of mentally ill individual and holding that "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends").

[60] The district court agreed, finding that *Foucha* shed no light on how state courts should consider dangerousness, and that "*Jones* similarly does not address the issue of whether future or potential dangerousness can be considered."

[61] *See* 538 U.S. at 71–72.

[62] *Jones*, 463 U.S. at 368–70; *Foucha*, 504 U.S. at 77–78; *see also O'Connor*, 422 U.S. at 575 ("A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement."). Poree does not contest the state court's finding of mental illness.

[63] *See* 463 U.S. at 368. Notably, circuit courts frequently use similar, open-ended language when reviewing federal pretrial bail denials. *See, e.g.*, *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) ("We review a district court's findings as to the accused's risk of flight and potential danger to the community for clear error."); *United States v. Provenzano*, 605 F.2d 85, 89–90, 94 (3rd Cir. 1979) (discussing the Bail Reform Act's "directive that courts must consider a convicted appellant's potential danger" in determining eligibility for bail).

18

dangerousness standard appears to be in tension with Louisiana law, the Supreme Court has not clearly established that a finding of "potential" dangerousness is insufficient to justify the continuing confinement of an NGBRI acquittee.

In denying Poree's transfer to Harmony House, the state court framed the legal standard as: "if the defendant still has a major, mental illness and presents as a *potential* danger to himself or to others . . . the Court may maintain its continued confinement of Mr. Poree." The state court found that it was not "satisfied that Mr. Poree does not present a *potential* for both danger to himself and to others" and that Poree's current asymptomatic status "does not negate the *potential* that Mr. Poree . . . would not manifest or relapse into the delusions and/or the behavior that presented itself through the years . . . ."

Poree argues that the state court's "potential" dangerousness standard is contrary to clearly established Supreme Court law because "[m]odifying dangerousness with 'potential' renders it meaningless." As stated above, Poree's argument overreads Supreme Court precedent. Together, *Jones* and *Foucha* establish that the state must prove two conditions to justify continued confinement of an NGBRI acquitee: mental illness and dangerousness. As *Poree* concedes, however, the Supreme Court has never precisely defined the contours of the dangerousness inquiry, and language in *Jones* suggests that the "dangerousness" finding is inherently predictive.[64] Thus, even if Poree is correct that dangerousness must have some temporal limitation to retain meaning, the Supreme Court has not provided any yardstick for determining what probability of danger is sufficient and what falls short. Particularly in light of *Jones*'s acknowledgement that one of the purposes of confining NGBRI acquittees is to protect society from "potential" dangerousness, it is not clearly

---

[64] *See* 463 U.S. at 364, 365 n.13, 368.

established that a court's finding of "potential" dangerousness, coupled with a finding of mental illness, is insufficient to justify continued confinement.

Although we hold that the state court's decision was not contrary to clearly establish Supreme Court law, we feel compelled to note that the state court appears to have applied a standard that is in tension with Louisiana law. Louisiana requires that the court determine "whether the committed person is no longer mentally ill . . . and can be discharged, or can be released on probation, without danger to others or to himself."[65] Louisiana defines "dangerous to others" and "dangerous to self" as "the condition of a person whose behavior or significant threats support a reasonable expectation that there is a substantial risk that he will inflict harm" on others or himself.[66] Thus, Louisiana law explicitly limits the probability of danger necessary to justify continued confinement: the state court must find "a reasonable expectation that there is a substantial risk" that the person will cause harm.[67] The state court here made no such finding. Rather, the court found that Poree "present[s] a *potential* for both danger to himself and to others" and that the expert testimony about Poree's current remission "does not negate the *potential* that [Poree] . . . would not manifest or relapse into the delusions and/or behavior that presented itself through the years."

---

[65] LA. CODE CRIM. PROC. ANN. art. 657 ("At the hearing the burden shall be upon the state to seek continuance of the confinement by proving by clear and convincing evidence that the committed person is currently both mentally ill and dangerous.").

[66] LA. STAT. ANN. § 28:2(3) and (4).

[67] The federal statute governing the discharge of NGBRI acquittees similarly elaborates upon its dangerousness requirement for release and conditional release. 18 U.S.C. § 4243(f) ("If, after the hearing, the court finds . . . that the person has recovered from his mental disease or defect to such an extent that--(1) his release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall order that he be immediately discharged; or (2) his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would no longer create a substantial risk of bodily injury to another person or serious damage to property of another . . .").

No. 14-30129

Despite this apparent inconsistency, we are not in a position to provide relief to Poree. Under § 2254, we may grant relief for legal error only when the state court's decision was contrary to clearly established federal law, as determined by the Supreme Court. Any remedy lies in Louisiana state courts, not federal habeas proceedings.

## B.

We next analyze whether the state court's decision "involved an unreasonable application of" clearly established Supreme Court law.[68] We conclude that Poree abandoned this argument. Throughout these habeas proceedings, Poree has been inconsistent as to whether he makes such an argument.[69] In his briefing to this Court, however, Poree does not make any clear, independent argument that the state court's denial of conditional release involved an unreasonable application of clearly established Supreme Court law.

"Issues submitted to this Court that are inadequately briefed are considered abandoned."[70] "To avoid waiver, a party must identify relevant legal standards and 'any relevant Fifth Circuit cases.'"[71] The clause "unreasonable application of" appears only once in Poree's opening brief—in the statement of

---

[68] 28 U.S.C. § 2254(d)(1).

[69] In his original application for a writ of habeas corpus in the federal district court, Poree cited the entire § 2254(d)(1) standard, but he made no independent argument that the state court's decision violated the "unreasonable application" clause. Upon being denied habeas relief in the magistrate judge's report and recommendation, Poree *did* raise the argument that the state court's decision involved an "unreasonable application" of federal law in his objections to the report and recommendation. Poree also argued that the state court's reliance on potential dangerousness was an unreasonable application of Supreme Court law in his request for a COA.

[70] *Davis v. Davis*, 826 F.3d 258, 266 (5th Cir. 2016) (citing *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994)); *accord Legate v. Livingston*, 822 F.3d 207, 211 (5th Cir. 2016) ("A party that fails to adequately address an argument asserted on appeal is deemed to have waived that argument." (citations omitted)).

[71] *JTB Tools & Oilfield Services, L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) (citations omitted); *accord United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010).

the standard of review—and never in his reply brief. "A 'passing reference to [a] claim . . . is insufficient to prevent . . . waiver.'"[72] Even though Poree raised the § 2254(d)(1) argument in general, because "§ 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning,"[73] raising one is insufficient to save the other from abandonment. Poree abandoned any "unreasonable application of" argument for failing to sufficiently argue it in his appellate brief.

## C.

Finally, Poree forfeited any argument that the state court's decision was "based on an unreasonable determination of the facts" under § 2254(d)(2) for failing to advance it in his district court application for writ of habeas corpus. At best, Poree could contend that he implicitly made the argument in his objection to the magistrate's report and recommendation and in his brief for COA in this court. But the fact remains that he did not specifically reference § 2254(d)(2) in either. This court's granting of a COA that encompassed the issue cannot revive what is otherwise a forfeited argument.[74]

In any event, it is unclear that this provision is even suitable for adjudication of this claim. Section 2254(d)(2) is used to review questions of fact.[75] The state court's determination of Poree's dangerousness, however, is not a pure question of fact.[76] Indeed, in his petition for writ in the district court

---

[72] *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) (citation omitted).

[73] *Bell*, 535 U.S. at 694 (2002) (citation omitted).

[74] *See Johnson v. Puckett*, 176 F.3d 809, 814 (5th Cir. 1999) ("We have repeatedly held that a contention not raised by a habeas petitioner in the district court cannot be considered for the first time on appeal from that court's denial of habeas relief." (quotation marks and citation omitted)).

[75] *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000); *see also Wood v. Allen*, 558 U.S. 290, 293 (2010) ("The Antiterrorism and Effective Death Penalty Act of 1996 contains two provisions governing federal-court review of state-court factual findings," and citing § 2254(d)(2) and § 2254(e)(1)).

[76] *See Powell v. Florida*, 579 F.2d 324, 333 (5th Cir. 1978) ("The second criterion, that the person is dangerous, presents a mixed question involving both a legal and social judgment

No. 14-30129

Poree stated, "Given that there is no debate as to the facts, Mr. Poree's claim must be reviewed pursuant to U.S.C. § 2254(d)(1)."

## V.

Because we hold that the state court's decision was not contrary to clearly established Supreme Court law, we AFFIRM the district court's denial of habeas relief

---

as well as a medical opinion."); *United States v. Ecker*, 543 F.2d 178, 190 (D.C. Cir. 1976) ("[T]he issue of 'dangerousness' presents the district court with a difficult mixed question of law and fact . . . ."). *But see United States v. Jackson*, 19 F.3d 1003, 1006 (5th Cir. 1994) (holding "that the district court's conclusion that [insanity acquittee] failed to prove he was entitled to release is a finding of fact . . . .").

No. 14-30129

PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:

Carlos Poree suffers from Schizophrenia. In 1977, he went on a shooting spree, killing one person. He was ultimately adjudicated not guilty by reason of insanity and was civilly committed to the Eastern Louisiana Mental Health System (ELMHS). Now, forty years after his horrific act, the doctors who know Poree best agree that he is fit for conditional release from ELMHS to Harmony House, a secure facility with continued treatment but increased privileges. One doctor described Poree as a "model patient." Another opined that he would comply with all conditions at Harmony House. A third indicated Poree's advancing age mitigates the risk of violent behavior. Against the unanimous recommendation of all who testified, including the state doctors, the state court denied the request for transfer. Poree petitioned for habeas relief.

The Supreme Court has clearly established the precondition of dangerousness for continued civil confinement of insanity acquittees. The state court, however, relied on a standard of *potential* dangerousness, stripping the dangerousness precondition of meaning. For this reason, the state court's decision was contrary to clearly established Supreme Court law. The majority holds differently, so I dissent.

Together, the touchstone cases of *Jones v. United States*[1] and *Foucha v. Louisiana*[2] established standards for the release of insanity acquittees.[3] I agree with the majority that "the governing legal principle derived from *Foucha* and *Jones* is that a state may continue to confine an insanity acquittee

---

[1] 463 U.S. 354 (1983).

[2] 504 U.S. 71 (1992).

[3] As stated in *Foucha*, "'(t)he committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous,' *i.e.*, the acquittee may be held as long as he is both mentally ill and dangerous, but no longer." 504 U.S. at 77 (quoting *Jones*, 463 U.S. at 368).

only as long as the acquittee is both mentally ill and dangerous." As the majority acknowledges, this means it is "clearly established that a finding of dangerousness is one of two prerequisites to continued civil confinement."

The state court made no finding of dangerousness. Instead, it made a finding of *potential* dangerousness. What at first blush seems like an innocuous, semantic difference is actually a potent one: the state court's potentially dangerous standard renders the Supreme Court's dangerousness requirement meaningless. "Potential" means merely "[c]apable of coming into being; possible."[4] But because it is *possible* for every insanity acquittee to become dangerous, the state court's standard lacks any limit. Although the Supreme Court has not explicitly decided how dangerousness may be determined, the dangerousness standard has a constitutional floor that a standard of potential dangerousness fails to reach.

Under the state court's standard, the state must only prove that the possibility exists for someone to become dangerous. This understanding of the dangerousness requirement lowers the bar to the point of conflicting with the clearly established law of *Foucha* and *Jones*.[5] In relying on a standard of potential dangerousness, the state court "applie[d] a rule different from the governing law set forth in" those cases.[6]

The majority opinion makes three missteps. First, it relies heavily on the Supreme Court's use of the term "potential dangerousness" without analyzing

---

[4] BLACK'S LAW DICTIONARY (9th ed. 2009); *accord* Merriam-Webster Dictionary (online ed.), *available at* http://www.merriam-webster.com (last visited July 27, 2017) (defining potential as, *inter alia*, "existing in possibility; capable of development into actuality.").

[5] *See Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) ("A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court . . . " (citation omitted)).

[6] *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citation omitted).

the context. The Supreme Court in *Jones* at one point stated: "The purpose of commitment following an insanity acquittal . . . is to treat the individual's mental illness and protect him and society from his potential dangerousness."[7] *Jones* thus uses "potential dangerousness" not to describe the standard for assessing dangerousness—the issue in this case—but to state a purpose of civilly committing insanity acquittees in the first place. We know this because the Court's very next sentence is that "[t]he committed acquittee is entitled to release when he has recovered his sanity or *is no longer* dangerous."[8] The Court's mere use of the term "potential dangerousness" in a context distinct from the dangerousness assessment does not detract from the commonsense conclusion that the dangerousness assessment must have meaning.

Second, throughout its opinion, the majority uses words like "predictive" and "probability" in reference to the dangerousness finding. For instance, it highlights that the Court in *Jones* found the dangerousness inquiry to be "predictive in nature" and "inherently predictive." It notes the lack of "any yardstick for determining what *probability* of danger is sufficient"[9] and explains that Louisiana law "limits the *probability* of danger necessary to justify continued confinement."[10] Importantly, the state court did not apply a standard of "predictive" dangerousness or "probable" dangerousness. It applied one of potential dangerousness. This matters because those modifiers have different meanings. Predict means "to declare or indicate in advance; *especially*" and to "foretell on the basis of observation, experience, or scientific

---

[7] 463 U.S. at 368.

[8] *Id.* (emphasis added) (citations omitted).

[9] Emphasis added.

[10] Emphasis added.

reason."[11] Probable means "supported by evidence strong enough to establish presumption but not proof" and "likely to be or become true or real."[12] "Potential," on the other hand, means "possible."[13] Predictive and probable cabin the dangerousness requirement in a more meaningful way than potential does, but whether a court can take predictions and probabilities of danger into account is not before us. The state court did not do so.

The majority's final misstep is its application of the "contrary to . . . clearly established Federal law" standard.[14] There are two steps in this case's § 2254(d)(1) analysis: first, we must identify the clearly established law; and second, we must ask whether the state court decision was contrary to it.[15] At step one, the majority agrees that it is "clearly established that a finding of dangerousness is one of two prerequisites to continued civil confinement." At step two, the question is whether the state court decision was contrary to this clearly established law. That is, did the state court "reach[] a legal conclusion in direct conflict with a prior decision of the Supreme Court"[16] or "appl[y] a rule different[ly] from the governing law set forth in [Supreme Court] cases"?[17]

Instead of analyzing this issue, the majority reverts to the clearly established law question—a question it already answered—to conclude that

---

[11] Merriam-Webster Dictionary (online ed.), *available at* http://www.merriam-webster.com (last visited July 27, 2017).

[12] Merriam-Webster Dictionary (online ed.), *available at* http://www.merriam-webster.com (last visited July 27, 2017).

[13] BLACK'S LAW DICTIONARY (9th ed. 2009).

[14] 28 U.S.C. § 2254(d)(1).

[15] *See Marshall v. Rodgers*, 133 S. Ct. 1446, 1449 (2013) (per curiam) ("The starting point for cases subject to § 2254(d)(1) is to identify the 'clearly established Federal law, as determined by the Supreme Court of the United States' that governs the habeas petitioner's claims." (citations omitted)).

[16] *Gray*, 616 F.3d at 439 (citation omitted).

[17] *Bell*, 535 U.S. at 694 (citation omitted).

the Supreme Court has not clearly established that what the state court did was incorrect.[18] Bringing to mind the Supreme Court's recent statements on "clearly established law" in the qualified immunity context,[19] the majority answers whether the state court's analysis was clearly established as improper, instead of answering whether the state court's decision was contrary to the clearly established law it previously identified.

In the § 2254(d) context, "'clearly established Federal law' . . . is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."[20] Moreover, it "'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions . . . '"[21] In *Foucha*, the Court explained its holding in *Jones*: "[w]e held . . . that '(t)he committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous,' *i.e.*, the acquittee may be held as long as he is both mentally ill and dangerous, but no longer."[22] The majority concludes that this means it is "clearly established that a finding of dangerousness is one of two prerequisites to continued civil confinement." Even the State agrees that "a showing of dangerousness was necessary in order to justify Poree's continued commitment." With the threshold question of identifying the clearly

---

[18] For example, the majority reasons that "the Supreme Court has not clearly established that a finding of 'potential' dangerousness is insufficient to justify the continuing confinement of an NGBRI acquittee." Similarly, it reasons that "it is not clearly established that a court's finding of 'potential' dangerousness, coupled with a finding of mental illness, is insufficient to justify continued confinement."

[19] *E.g.*, *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" (citation omitted)).

[20] *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003) (citations omitted).

[21] *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

[22] 504 U.S. at 77 (quoting *Jones*, 463 U.S. at 368).

established law answered, the remaining question is whether the state court's decision was contrary to it. The majority largely avoids this analysis.

Because the state court's standard of potential dangerousness strips the dangerousness precondition of meaning, I would find that the state court's decision was contrary to clearly established Supreme Court law. Civil confinement is not punitive. It may not be used to accomplish what the criminal system could not—here, a life sentence. The systems are distinct in both justification and operation. They will remain so only if courts are faithful to the requirements of continued civil confinement. The state court decision went beyond those bounds in direct conflict with Supreme Court law. I dissent.